Joseph M. GIESLER, Jr., Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD OF the UNITED STATES (DEPARTMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION), Respondent.

No. 80–2176.

United States Court of Appeals, Tenth Circuit.

Aug. 18, 1982.

Rebecca Elliott, Fort Collins, Colo., for petitioner.

Janis E. Chapman, Asst. U. S. Atty., Denver, Colo. (Joseph Dolan, U. S. Atty. and Beverly Buck, Sp. Asst. U. S. Atty., Denver, Colo., on the brief), for respondent.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Joseph M. Giesler (Giesler) appeals from a final decision of the Merit Systems Protection Board of the United States (Board).

Giesler, a veteran, was initially trained and employed by the Department of Transportation's Federal Aviation Administration

in early 1970 as an air traffic control specialist. Giesler has since continuously served as an air traffic controller and received numerous commendations for his superior work.

In October 1978, Giesler was serving as a controller at the Federal Aviation Administration's Air Route Traffic Control Center in Longmont, Colorado, and was a member of the Professional Air Traffic Controllers Organization (PATCO).

Giesler's union, PATCO, and the FAA had entered into an agreement relative to disciplinary proceedings, set forth in Article 6, Section 1, to-wit:

No disciplinary action may result from a meeting between an employee and his supervisor and/or other management official unless the employee is advised that such meeting is for the purpose of discussing discipline or potential discipline, and the employee is allowed Union representation, if he so desires. If a request for representation is made, it shall be honored. However, nothing in this Section shall preclude the subsequent use of previous discussions or events as a basis for disciplinary action in another instance involving nonadherence to pertinent directives/regulations or repetitive instances of misconduct.

[Pet. Ex. 1, p. 47].

On October 12, 13, 14, and 15, 1978, at a time when he was scheduled to work, Giesler arranged for sick leave and went hunting. On November 1, 1978, Francis Herman, Giesler's supervisor, having heard rumors to the effect that Giesler had not been ill but had in fact taken sick leave to go hunting, approached Giesler and inquired if he had actually been hunting on the days he had arranged for sick leave. In response, Giesler stated "negative". Giesler also related to Herman that he was in Glenwood Springs at the time suffering from what he thought to be intestinal flu.

On November 2, 1978, Herman met with Giesler, accompanied by a union representative, to discuss further Giesler's sick leave for the days in question. During the course of this meeting Giesler denied, for the second time, that he had gone hunting during the period he had arranged for sick leave.

Herman later filed a written report delineating his reasons for the initial contact with Giesler, which stated in part:

... On or about October 18, 1978, Assistant Chief Mahrt and myself became involved in a discussion about ATCS Giesler's use of sick leave ..... During our discussion we became aware that each of us had been confronted by other supervisors with innuendoes that it seemed to be common knowledge among controller personnel that Mr. Giesler was hunting with ATCS Ron Nusbaum while he was absent from duty on sick leave.

Having no proof or witnesses who had actual knowledge of the circumstances of Mr. Giesler's sick leave, but having a strong suspicion that what we were hearing might have some basis, Mr. Mahrt and I decided we had no alternative but to check into this matter further. We decided the best method would probably be direct confrontation upon Mr. Giesler's return to duty. Therefore, on November 1, 1978, when ATCS Giesler returned to duty, I met privately with him at approximately 1630 local time and confronted him with the suspicions we had regarding his use of sick leave on October 12, 13, 14, 15, 1978, and again at 1900 local time to clarify a few items.

[R., Vol. I at p. 45].

On November 30, 1978 Giesler and his union representative met with Herman a second time relative to Giesler's use of sick leave. During this meeting Giesler admitted, for the first time, that he had in fact gone hunting during the period he had arranged for sick leave and that he took sick leave because of his inability to obtain annual leave at that time.

On February 1, 1979, Giesler was notified by Ralph Kiss, Chief, Denver Center, that it was being proposed that he be terminated for being "absent without approved leave for four consecutive work days" and for "providing false information to your supervisor in the inquiry of sick leave usage".

On March 23, 1979, Giesler was afforded the opportunity to make an "oral presentation" relative to his proposed termination. During the course of this meeting, one Mr. Eads, of PATCO stated that: perhaps Giesler, like many government employees had been lured into a false sense of security regarding the requirement to not abuse sick leave; consideration should be given to Giesler's past record as a good and productive employee; and that the punishment (termination) appeared to be too severe and harsh and not in keeping with the agency's policy regarding progressive discipline.

Giesler stated that he came to Denver for the good of the agency; he had served in the military; his sick leave abuse was not preplanned but arose as the result of an overall situation involving loyalty to a fellow employee who was under duress; and that as a result of his friendship he felt compelled to accompany his fellow employee who had planned to go to the mountains alone with a weapon.

During the same meeting a Mr. Haggerty of PATCO appeared in Giesler's behalf and related: Giesler was not aware of the seriousness of the November 1, 1978 meeting between himself and Francis Herman nor was a union representative present; the presence of a union representative may have changed the outcome of the meeting; and that at the more formal meeting on November 2, 1978, Giesler felt compelled to "stick with his story of November 1".

At the conclusion of Giesler's oral presentation, a recommendation was made that Giesler's punishment be reduced from termination to a 35 day suspension. Included within the memorandum recommending the suspension was the following:

> In view of the above, and after careful review of the case file, it is my opinion that removal in this case is not in keeping with the agency's policy regarding progressive discipline. However, the matter is serious and the pursuit of truth in this case has required a great deal of extraor-

dinary effort on the part of the agency management in reaching the point where we are at present.
[R., Vol. I at p. 40].

On April 12, 1979 Giesler was formally notified that his proposed termination was being reduced to a suspension of 35 calendar days. Included within this was notification to Giesler of his right to appeal the decision to the Board.

On May 18, 1982, Giesler formally appealed his suspension to the Board. Within his appeal Giesler contended, *inter alia*, that: the Federal Aviation Administration (FAA) had violated its agreement with PATCO that no disciplinary action could result from a meeting when an employee is not advised of the possible consequences of the meeting and is not afforded the opportunity to have a union representative present; he was not apprised of the possible consequences of the November 1, 1978 meeting or that he could have a union representative present; the questions relative to his abuse of sick leave should have been handled in an informal manner; the suspension violated the FAA's policy of graduated punishment; the suspension was too severe and did not promote punishing like behavior consistently; and that the charges against him be dismissed or alternatively "be corrected to specify sick leave abuse".

A board certified hearing was conducted on July 5, 1979.[1] Thereafter, on July 19, 1979, the presiding official entered her initial decision, which determined, *inter alia*: Giesler was absent without approved leave for four consecutive work days; after being properly advised of his right to representation and of the possible consequences of his wrongful use of sick leave, Giesler denied (for the second time) during the November 2, 1978 meeting that he had been hunting on the days in question; in view of the November 2, 1978, meeting, the FAA did not commit harmful error when it did not apprise Giesler of the procedural effect of the November 1, 1978 meeting and his right

---

1. Giesler's request for a continuance was denied by the presiding official after the she determined that the FAA had "served the docu-

ments relied upon for taking the adverse action upon Mr. Giesler . . . ."

to have a union representative present; the FAA attempted to settle the matter informally but Giesler failed to cooperate with the FAA's informal attempt at resolution; FAA agency orders provide that the penalties for intentionally giving false information during an inquiry range from written reprimand to removal; the FAA did not abuse its discretion in imposing the 35 day suspension; and the suspension herein "was taken for such cause as will promote the efficiency of the service." [R., Vol. I at p. 118].

Giesler subsequently petitioned Board for a review of the initial decision of the presiding official alleging that: the FAA had failed to follow its regulations relative to the presence of a union representative at meetings for disciplinary purposes; the penalty imposed was too severe; and that he had been denied meaningful discovery prior to the hearing with regard to the precept of like penalties for like offenses.

In affirming the initial decision of the presiding official the Board determined, *inter alia*: there was no violation of the union agreement with regard to union representation in a meeting to discuss possible abuse of sick leave when, as here, petitioner [Giesler] met with his supervisor on three occasions and a union representative was present during the last two meetings; Giesler was afforded adequate pre-hearing discovery; and specifically:

Violations of trust necessary to the employer-employee relationship, as proven in this case, affect the efficiency of the service. It can hardly be challenged that an agency has the right to expect its employees to be truthful in all matters of official business. Moreover an agency has a right to have employees in attendance, absent a valid excuse. The two reasons advanced for taking adverse action were sustained by the preponderance of the evidence, and we find that the agency action under the facts and circumstances of this case was for such cause as to promote the efficiency of the service.

Accordingly ... the Board hereby affirms the initial decision of July 19, 1979.

[R., Vol. I at pp. 165–166].

On petition for review Giesler contends: (1) the FAA committed harmful error in failing to follow its own regulations and breached its contractual duty to Giesler under the PATCO agreement; (2) the FAA failed to present any evidence that the discipline imposed was for such good cause as would promote the efficiency of the service or that in determining what discipline to impose they had considered Giesler's status as a veteran; (3) that he was denied his right to challenge his punishment by the FAA's failure to provide him with meaningful discovery and the failure of the Merit Systems Protection Board to recognize this right.

At the outset we observe that the Civil Service Commission was reorganized into the Merit Systems Protection (Board) and the Office of Personnel Management effective January 11, 1979. *Phillips v. Merit Systems Protection Board*, 620 F.2d 217 (10th Cir. 1980). Our review is limited on appeal. In *Henkle v. Campbell*, 626 F.2d 811 (10th Cir. 1980) we stated:

Our scope of review on appeal is narrow. We must uphold the Commission's findings of fact if they are supported by substantial evidence. *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951); *accord Ballard E. Spencer Trust, Inc. v. Morton*, 544 F.2d 1067, 1069 (10th Cir. 1976). Also, in reviewing the Commission's application of legal concepts to the facts, we must insure that "the required procedures have been followed and that the [agency's] action is not arbitrary or capricious." *Hurley v. United States*, 575 F.2d 792, 793 (10th Cir. 1978).

626 F.2d at pp. 811–812. [Footnote omitted].

■ The Board's interpretation of its own rules and regulations must also be upheld unless determined to be clearly erroneous. In *Hurley v. United States*, 575 F.2d 792 (10th Cir. 1978) we stated:

... The Board's interpretation of its own rules and regulations must be sustained

and applied as controlling law unless that interpretation is plainly erroneous or inconsistent with the regulations. [citations omitted] In our review of the Board's application of legal concepts to the undisputed facts, however, it is the duty of this court to set aside a decision of the Board if it is "arbitrary, capricious . . . or otherwise not in accordance with law." [citations omitted] The scope of our review is therefore quite narrow, limited to ensuring that the required procedures have been followed and that the Board's action is not arbitrary or capricious. The arbitrary and capricious standard of review does not require that the agency's decision be supported by substantial evidence, but only that it have a rational basis in the law. [citations omitted]

575 F.2d at pp. 793–794.

*See also: Garvey v. Freeman*, 397 F.2d 600 (10th Cir. 1968); *Giles v. United States*, 553 F.2d 647 (Ct.Cl.1977).

It is within these parameters that we address Giesler's specific allegations of error.

## I.

Giesler contends the FAA committed harmful error in failing to follow its own regulations and breached its contractual duties to him under the PATCO agreement. Underlying these contentions are Giesler's arguments that the FAA initiated its review of the sick leave in an informal manner, and therefore was estopped from thereafter proceeding in a formal manner; and the FAA did not comply with Article 6 § 1, *supra*, at the November 1, 1978 meeting. We hold that Giesler's contentions are without merit.

Giesler's contention that since the FAA initiated its review of his sick leave abuse in an informal manner it was precluded from thereafter proceeding in a formal manner is specious. As discussed, *supra*, Giesler's supervisor, Herman, initially approached Giesler on November 1, 1978 to informally inquire as to Giesler's suspected abuse of sick leave when it seemed to be "common knowledge" that Giesler had gone hunting and "having a strong suspicion that what we are hearing might have some basis".

Nothing in the regulations or record before us, aside from Giesler's bald assertions, leads us to conclude that the initial informal encounter of November 1, 1978, was anything but correct and proper in an initial investigatory context. Indeed, Herman would have been derelict in his duties had he not made an initial inquiry of Giesler.

■ Subsequent thereto, and only after Giesler lied about being sick and not having gone hunting, the FAA was obligated to undertake a more formal investigation of Giesler's suspected abuse of sick leave. Under such circumstances we cannot accept Giesler's egregious proposition that the FAA was precluded from continuing its investigation on a formal basis. Giesler's contentions are illogical when we consider that it is uncontested that if Giesler had related the truth surrounding his abuse of sick leave the entire disciplinary proceeding would have been quickly effectuated—and concluded—in an informal manner.

■ Giesler's related argument that the FAA violated its contractual duty to him by not complying with Article 6 § 1 of the PATCO agreement is also without merit. The record establishes that after the initial informal meeting of November 1, 1978 between Herman and Giesler that the FAA proceeded with its disciplinary investigation in full compliance with Article 6 § 1. Thereafter, during the course of the November 2, 1978 meeting, Giesler, having been fully apprised of the nature of the meeting and the disciplinary repercussions which could occur, and at a time when he was accompanied by a union representative, lied for the second time relative to his abuse of sick leave. In view of the informal nature of the November 1, 1978 meeting, and the FAA's full compliance with the PATCO agreement during the November 2, 1978 meeting, we hold that the FAA did not breach its contractual obligations to Giesler and that harmful error did not occur.

## II and III.

Giesler contends that the record fails to disclose that the discipline imposed was for such good cause as would promote the efficiency of the service. Giesler also contends that he was denied his right to challenge his punishment by the FAA's refusal to afford him meaningful discovery relative to whether like punishment had been rendered for similar problems.

██ The remedy necessary to promote efficiency of civil service is a matter peculiarly and necessarily within the discretion of the agency involved. *Bishop v. McKee*, 400 F.2d 87 (10th Cir. 1968); *Tucker v. United States*, 224 Ct.Cl. 266, 624 F.2d 1029 (1980); *Phillips v. Bergland*, 586 F.2d 1007 (4th Cir. 1978); *Adkins v. Hampton*, 586 F.2d 1070 (5th Cir. 1978); *Young v. Hampton*, 568 F.2d 1253 (7th Cir. 1977).

██ In *Tucker v. United States, supra*, the court, in citing to *Young v. Hampton, supra*, set forth that which we deem to be the correct standard applicable when determining whether an agency has met its burden of establishing that the punishment will promote efficiency within the agency:

> Plaintiff next contends the FAA did not establish that plaintiff's removal for the complained of conduct would promote the efficiency of the FAA. The recent case of *Young v. Hampton*, 568 F.2d 1253 (7th Cir. 1977) (written by Kunzig, J., sitting by designation), articulates what we feel is the proper test to use in determining whether this connection exists. The court there indicated that the employer agency must demonstrate some rational basis for its conclusion that discharge will promote the efficiency of that agency. If this rational basis exists, then for purposes of judicial review the discharge does in fact promote the efficiency of the agency.

624 F.2d at pp. 1033–1034.

We hold that the FAA demonstrated a rational basis for its conclusion that the suspension imposed on Giesler would promote its efficiency as an agency. In recommending the 35 day suspension, the FAA's oral presentation hearing officer noted that which we deem to be relevant:

> ... However, the matter is serious and the pursuit of truth in this case has required a great deal of extraordinary effort on the part of the agency management ...

[R., Vol. I at p. 40].

Giesler's contention that he was not afforded meaningful discovery to compare whether similar punishments had been given for like problems is without merit. It is uncontested that the FAA was empowered to suspend *or* terminate Giesler for his abuse of sick leave and his related, repeated lies about same. In any event, our review of agency assessed penalties is limited. *Davis v. Berzak*, 405 F.2d 642 (10th Cir. 1969); *Boyce v. United States*, 211 Ct.Cl. 57, 543 F.2d 1290 (1976).

In *Boyce, supra*, the court stated:

> We start our inquiry into the propriety of the penalties by again stating the standard for review of administrative sanctions. In an overall sense, it is well established that the penalty for employee misconduct is a matter usually left to the sound discretion of the executive agency. *See, e.g., Hoover v. United States*, 513 F.2d 603, 206 Ct.Cl. 640 (1975); *Birnholz v. United States*, 199 Ct.Cl. 532 (1972); *Cook v. United States*, 164 Ct.Cl. 438 (1964). However, if the punishment exceeds the range of sanctions permitted by statute or regulation, *Daub v. United States*, 292 F.2d 895, 154 Ct.Cl. 434 (1961); *Cuiffo v. United States*, 137 F.Supp. 944, 949, 131 Ct.Cl. 60, 68 (1955), or if the penalty is so harsh that it amounts to an abuse of discretion, *Heffron v. United States*, 405 F.2d 1307, 1312, 186 Ct.Cl. 474, 484 (1969); *Jacobowitz v. United States*, 424 F.2d 555, 563, 191 Ct.Cl. 444, 458–59 (1970), it cannot be permitted to stand. 543 F.2d at p. 1292.

██ Giesler's punishment did not exceed the range of sanctions permitted. We do not deem it so harsh as to amount to an abuse of discretion.

AFFIRMED.