**Vaughn LETENYEI, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, FAA, Respondent.**

**Appeal No. 83–1174.**

United States Court of Appeals, Federal Circuit.

May 18, 1984.

---

Sandra P. Spooner, Washington, D.C., argued for respondent. With her on the brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, and M. Susan Burnett, Washington, D.C.

Stephen C. Cooper and Steven Z. Cohen, Southfield, Mich., were on the brief for amicus curiae on behalf of petitioner.

Before MARKEY, Chief Judge, and FRIEDMAN, RICH, SMITH and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

The only issue we discuss in this case is whether, in sustaining the decision of the Federal Aviation Administration (Administration) removing the petitioner from his position as an air traffic controller for participating in the illegal air traffic controllers strike in August 1981, the Merit Systems Protection Board (Board) correctly rejected the petitioner's argument that his absence from work resulted not from his participation in the strike but from his having been on annual leave. We vacate the Board's decision and remand for further proceedings consistent with this opinion.

I

The facts relating to the nationwide air traffic controllers strike are set forth in our opinion in *Schapansky v. Department of Transportation*, 735 F.2d 477 decided today. A strike called by the Professional Air Traffic Controllers Organization ("PATCO") began at 7 a.m. on August 3, 1981. At 11 a.m. on that date the President announced that the strike was illegal and that any striking controller who had not returned to work by 11 a.m. on August 5 would be discharged.

Letenyei had been authorized annual leave from August 2 through August 15, 1981. On August 1, 1981, the day before his annual leave was scheduled to begin, Letenyei's supervisor notified him by telephone that his leave had been cancelled, effective 3:18 p.m. on August 3, 1981. Letenyei did not report for work on August 3 or 4, or for his shift on August 5 following

Julian A. Wilhelm, Washington, D.C., argued for petitioner. With him on the brief were J. Thomas Burch, Jr., and David W. McDonald, Washington, D.C.

the expiration of the Presidential deadline. On August 6, 1981, the Administration sent petitioner a written notice of proposed removal for striking and for being absent without leave beginning on August 3, 1981. Because Letenyei had moved, he did not receive the notice until August 20, 1981.

On August 15, 1981, the day before his previously scheduled leave had been due to expire, Letenyei called the agency to ascertain the shift on which he was scheduled to work on the following day. The agency told him not to report for work but to call two days later to arrange for an oral hearing.

On August 28, 1981, Letenyei made his oral response to the notice of proposed removal. He told the oral reply officer that he had made arrangements to move and to sell his house and then to go on vacation during his scheduled leave; that when he was informed on August 1 that his leave was cancelled, he was in the midst of moving and had a loaded truck at his house; that at that time "my priority was to take care of the houses and I could not change vacation plans"; and that "[o]wning two houses at the time and with moving and preparing both houses, it was just that I could not change plans or it would cost thousands within a week." At the subsequent hearing before the Board, Letenyei also contended that the collective bargaining agreement between PATCO and the Administration precluded the agency from cancelling his leave.

After considering the oral reply, the Administration removed Letenyei for participation in the strike and absence without leave as charged. Letenyei appealed his removal to the Board.

A hearing was held before the presiding official of the Board's regional office. The presiding official reversed the Administration's removal of Letenyei from his position. She held that under the collective bargaining agreement the agency had no authority to cancel Letenyei's leave. She further found that "there is *no* evidence that [Letenyei's] refusal to [provide services to his employer] was in concert with

others.... Rather, at all times since his leave was cancelled, [he] had insisted that the leave cancellation was improper, in violation of the union contract, and unacceptable to him because of his moving and vacation plans." *Kays v. Department of Transportation*, Nos. CH075281F2014, CH075281F2202, slip op. at 5 (M.S.P.B.Phil. Reg'l Off. Nov. 22, 1982) (emphasis in original).

The presiding official held that Letenyei "was indeed AWOL on August 3–6, 1981 as charged by the agency." *Id.* at 7. She based this conclusion upon his failure to obey the agency's order to report for work on August 3, 1981. Although she held that order was improper, she further held that the petitioner was obligated to obey it and to depend upon the grievance procedure in the collective bargaining contract for redress. She ruled, however, "that removal for this AWOL offense is excessive," *id.* at 8, and ordered the agency "to substitute a 60 day suspension" as the penalty. *Id.* at 12.

On the agency's appeal, the Board reversed and reinstated the Administration's removal action. The Board held that the collective bargaining agreement did not preclude the agency from cancelling Letenyei's leave. *Kays v. Department of Transportation*, Nos. CH075281F2014, CH075281F2202, slip op. at 4 (M.S.P.B. Apr. 25, 1983). Noting that Letenyei had "appear[ed at the picket line] at various times during the strike, and ... attended a PATCO rally on August 5, 1981," *id.* at 5, the Board concluded that Letenyei "has failed to rebut the agency's *prima facie* case in support of the charge of his participation in the PATCO strike...." *Id.* at 6.

II

A. Letenyei contends that the collective bargaining agreement between PATCO and the Administration barred the agency from cancelling his leave. He relies upon section 1 of article 28 of the agreement which, after specifying that each eligible employee was entitled to at least three consecutive

weeks of annual leave for vacation, provided that

> [t]his leave shall not be cancelled or rescheduled except for an operational emergency, or at the request of the employee.

He argues that this language authorized the Administration to cancel leave only when an operational emergency actually existed, but not in anticipation of one. Since the strike had not begun when the Administration cancelled his leave on August 1, 1981, Letenyei contends that the agreement precluded cancellation on that day. From these premises he apparently reasons that he still was on annual leave during the period the Administration found he was on strike (August 3–6) and that the strike finding therefore falls.

As noted, the presiding official adopted this interpretation of the agreement. She concluded that "a contract violation occurred when appellant's leave was cancelled." *Kays,* slip op. at 6 (Phil.Reg'l Off.).

In holding that the contract did not bar the cancellation of Letenyei's leave, the Board relied upon its earlier decision in *McPartland v. Department of Transportation,* No. DA075281F1018 (M.S.P.B. Feb. 8, 1983), which it described as holding that this contract provision

> requires only the existence or reasonable likelihood of the existence of an operational emergency before steps may be taken to cancel approved leave prospectively or actually to cancel such leave during the duration of the emergency. In this case, an operational emergency clearly existed as a result of the job action beginning on August 3, 1981.

The Board then ruled:

> Further, the possibility of the occurrence of such an operational emergency was reasonably foreseeable on August 1, when the agency cancelled appellant's leave....
>
> ... the agency's prospective cancellation of appellant's annual leave in anticipation of the imminent and reasonably foreseeable operational emergency was

proper, and did not constitute a violation of the applicable PATCO–FAA bargaining agreement. Such leave was effectively cancelled so that appellant's absence beginning on August 3, 1981, was unauthorized.

*Kays,* slip op. at 4–5 (M.S.P.B.) (footnotes omitted).

■ We agree with the Board's interpretation of the agreement. Although article 28 recognized the importance of giving controllers annual vacation leave, it further recognized that the Administration must be able to cancel leave when "an operational emergency" required it. The threat of an imminent national strike by the air traffic controllers fully justified, indeed required, the agency to cancel Letenyei's leave so that he would be available to work during the strike. August 1, the day on which the agency cancelled his leave, was, as the Board pointed out, only two days before the day on which the national president of PATCO had announced that the strike would begin.

This leave-cancelling provision obviously was designed to enable the agency to keep controllers on the job to deal with operational emergencies that might arise. Letenyei's interpretation of the contract— that it permitted the Administration to cancel his leave only after the strike had begun, but not when the strike was imminent—is inconsistent with the basic purpose of the provision of giving the agency sufficient flexibility with respect to cancelling leave to enable it to deal effectively with emergency operational situations.

The amicus curiae points out that in holding in *Giesler v. Department of Transportation,* 3 M.S.P.B. 367 (1980), *aff'd,* 686 F.2d 844 (10th Cir.1982), that the Board would treat provisions of a collective bargaining agreement the same as it treats agency regulations, the Board described the collective bargaining agreement there as having "established nondiscretionary policy under which the [agency] operates." 3 M.S.P.B. at 368. The amicus curiae argues that since the decision of the Adminis-

tration to cancel Letenyei's leave was discretionary, the Board treated the collective bargaining agreement here differently than it treated such agreement in *Giesler*.

The "nondiscretionary policy" reflected in the PATCO agreement, however, was the basic concept that leave would not be cancelled except for "an operational emergency." The determination whether such an emergency existed was for the Agency to make initially, and the making of that determination necessarily involved the exercise of the Agency's discretion. *Giesler* cannot be read as barring the agency from cancelling Letenyei's leave two days before the PATCO strike began.

B. Participation in a strike has been defined authoritatively as "an actual refusal in concert with others to provide services to one's employer." *United Federation of Postal Clerks v. Blount*, 325 F.Supp. 879, 884 (D.D.C.), *aff'd mem.*, 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971). In *Schapansky* we have held that the government establishes a *prima facie* case of strike participation by showing (1) the existence of a generally known strike, and (2) the employee's unauthorized and unexplained absence from work during the strike. We further held that once the government had made that showing, "the burden of going forward with evidence to rebut that showing necessarily shifts to the employee...." *Schapansky*, at 482.

■ Since we have held that the collective bargaining agreement did not bar the Administration from cancelling Letenyei's leave, Letenyei has not rebutted the Administration's *prima facie* case that his refusal to work was unauthorized. The question, therefore, is whether Letenyei has rebutted the government's *prima facie* case on the second element of striking— whether Letenyei's refusal to work was "in concert with others."

The presiding official held that although Letenyei "did refuse to provide services to his employer,"

there is *no* evidence that appellant's refusal to do so was in concert with others or that it was connected to or a result of the PATCO strike. Rather, at all times since his leave was cancelled, appellant had insisted that the leave cancellation was improper, in violation of the union contract, and unacceptable to him because of his moving and vacation plans.

*Kays,* slip op. at 5 (Phil.Reg'l Off.) (emphasis in original).

The presiding official noted that Letenyei "stated repeatedly that he never picketed, participated in the strike vote, or supported the strike." *Id.* at 6. She "accepted [Letenyei's] testimony as truthful." *Id.* at 7.

The stated grounds upon which the Board reversed the presiding official's decision and held that Letenyei "has failed to rebut the agency's *prima facie* case in support of the charge of his participation in the PATCO strike," *Kays,* slip op. at 6 (M.S.P.B.), were as follows:

The record further reveals that appellant's absence was not due to any inability to report for work. He testified that had he received, after the commencement of the strike, direction from his supervisors to report for duty, he would have returned to work. In addition, he does not dispute that his services were intentionally withheld despite the agency's order of August 1, 1981, requiring him to report on August 3, 1981. Moreover, while proof of an employee's physical presence on a picket line is not an essential element of a charge of strike participation, there is evidence that appellant did so appear at various times during the strike, and in fact, that he also attended a PATCO rally on August 5, 1981.

*Id.* at 5 (footnote and citations omitted).

On the basis of this reasoning and analysis, we cannot sustain the Board's decision. The fact that Letenyei was able to work during the strike period does not establish that his failure to do so was the result of his acting in concert with other controllers. It is equally compatible with his belief that his leave had been improperly cancelled and his attitude that completing his move and the sale of his house and taking his vacation were more important than prompt-

ly returning to work. Although one may condemn this attitude, its existence does not show that Letenyei's failure to work resulted from his participation in the strike.

The presiding official accepted as "truthful" Letenyei's testimony that "he never picketed, participated in the strike vote, or supported the strike" —although she did not explicitly so find. Although the Board stated that "there is evidence" that Letenyei "appear[ed]" on the picket line "at various times during the strike," it did not find that he had picketed. Nor did it give any explanation of the rejection of his testimony, which the presiding official accepted, that he had not picketed or otherwise participated in the strike.

The "evidence" of picketing to which the Board referred may have been a note in the Administration's file "from Mr. Lang [the deputy chief of the installation] that someone reported to him that [Letenyei] was seen on the picket line one day." *Kays,* slip op. at 7 (Phil.Reg'l Off.). The presiding official found this evidence insufficient to overcome Letenyei's testimony because "[n]o document or note from that observer appears in the file, and the agency did not present either Mr. Lang or the alleged observer as witnesses at the hearing, although Mr. Lang did appear as an agency witness in the appeal of William Kays." *Id.*

If that was the evidence upon which the Board relied for its conclusion that Letenyei had been on the picket line, the Board failed to explain why, in view of the presiding official's ruling, it nevertheless found its analysis sufficient to overcome Letenyei's contrary, credited testimony.

The Board also stated that Letenyei attended a PATCO rally on August 5, 1981. In his testimony Letenyei denied that he had attended a PATCO rally between August 3 and 5. He stated that he had stopped by PATCO headquarters for approximately 10 minutes because he had heard that some people he wanted to see were there, but that since they were not there, he left. He also stated that although "there was some type of a rally in progress," he "did not stay around to see what it was." Although the presiding official did not make any findings on or even discuss this incident, she "accepted" Letenyei's "testimony as truthful." Once again, in dealing with this incident, the Board was required to say something more than it did.

In sum, the Board has not adequately explained its reasons for rejecting the presiding official's determination that Letenyei rebutted the Administration's *prima facie* case that his absence from work resulted from participation in the strike. The Board did not even mention its statement in its earlier decision in *Trick v. Federal Aviation Administration,* No. DC0752811F1144, slip op. at 6 (M.S.P.B. Dec. 17, 1981) (footnote omitted), that controllers "who successfully demonstrate that their absence from work at the time of the alleged strike resulted from . . . a good faith belief that they were on approved leave, might be found not to have participated in the alleged unlawful strike." On the basis of what the Board has said, we cannot sustain its decision.

In so holding, however, we are not ruling that on the record before it the Board could not have made a valid determination that Letenyei participated in the strike. We hold only that it has not done so.

Because of the seriousness of striking against the government, we conclude that instead of reversing the Board's decision outright, we should vacate it and remand to the Board for reconsideration in light of this opinion. Upon the remand, the Board may make any determination it believes is justified on the basis of the record before it, but it must adequately explain the reasons for its decision. If the Board again rejects the decision of the presiding official, it must fully state the grounds for doing so. If the Board concludes that additional evidence is required before it decides the case, it may remand to the presiding official to reopen the record.

There is another point the Board may wish to consider on remand. The National Labor Relations Act protects employees engaged in concerted activities for their mu-

tual aid and protection, but not action by employees individually, from employer interference. 29 U.S.C. §§ 157, 158 (1982). An employee who stays out of work for dual motives—because he supports the strike, but also because he is afraid to cross the picket line—is viewed as participating in the strike, and therefore has engaged in protected activity. This is so because a refusal to cross the picket line "based on fear and nothing else," does not constitute action in concert with other employees. *N.L.R.B. v. Union Carbide Corp.*, 440 F.2d 54, 56 (4th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971); *see also Coors Container Co. v. N.L.R.B.*, 628 F.2d 1283, 1287–88 (10th Cir. 1980); *Virginia Stage Lines v. N.L.R.B.*, 441 F.2d 499, 502 n. 3 (4th Cir.), *cert. denied*, 404 U.S. 856, 92 S.Ct. 105, 30 L.Ed.2d 98 (1971).

Unlike the situation under the National Labor Relations Act, where employee action is protected only if it is concerted but not if it is individual, the opposite situation exists for federal employees, who engage in strike action (which is a crime) only if they withhold service in concert with others but not individually. Perhaps, by analogy, a government employee who stays away from work, both for non-strike related motives and also because he supports the strike, could be viewed as striking. *Cf. Jones v. T.V.A.*, 1982 Fed.Merit Sys.Rep. ¶ 7008 (M.S.P.B. Feb. 19, 1982), and *Duckett v. T.V.A.*, 1982 Fed.Merit Sys.Rep. ¶ 7013 (M.S.P.B. Feb. 19, 1982), where the Board drew upon precedents under the National Labor Relations Act, including *Union Carbide*, in determining questions of strike participation by government employees. As noted, there is some evidence in the record indicating that Letenyei's actions reflected his participation in the strike. Of course, we express no views on this issue but indicate only that the Board may consider the question on the remand if it so wishes.

Finally, if the Board were to hold that Letenyei had not participated in the strike, it should consider the correctness of the 60-day suspension the presiding official substituted for the removal the Administration ordered—if it concludes that that issue was properly raised before it.

C. Letenyei makes a number of other contentions, all of which are dealt with in the other air traffic controller cases we decide today. Accordingly, we need not address them.

## CONCLUSION

The decision of the Merit Systems Protection Board sustaining the Administration's removal of petitioner Letenyei is vacated, and the case is remanded to the Board for further proceedings consistent with this opinion.

VACATED AND REMANDED.

NIES, Circuit Judge, with whom RICH, Circuit Judge, joins, dissenting.

I would affirm the decision of the Merit Systems Protection Board in this appeal and, accordingly, dissent from the majority's decision to remand.

Vaughn Letenyei was removed by the agency for strike participation and being absent without leave "beginning at 1518 on August 3, 1981." The presiding official, the board, and the majority agree that Letenyei was AWOL on August 3, 4, 5 and 6. Under the decisions issued today, particularly *Adams v. Department of Transportation, FAA*, 735 F.2d 488 at 492 (Fed. Cir.1984), and *Campbell v. Department of Transportation, FAA*, 735 F.2d 496 at 496 n. 1 (Fed.Cir.1984), Letenyei was AWOL until he telephoned the agency on August 15 requesting to return to work on August 16. Moreover, he defied a direct order to return to work beginning August 3, 1981 at 1518 hours. He was also scheduled for shifts at the same time on August 4 and 5, the August 5 shift being after the Presidential deadline.

Letenyei stipulated that a strike was in effect from August 3 until at least August 6, and that he was aware of the strike and

understood that the strike was illegal. He was also aware that he was scheduled for work after the strike was called.

The thrust of Letenyei's position is that his leave could not be cancelled on August 1 because there was no operational emergency *on that date*. The presiding official agreed, stating:

> [A]t the time [the agency] cancelled appellant's leave, no operational emergency existed; and no successful effort was made by Cleveland Center personnel to reach appellant on or after August 3 once the operational emergency was declared to again order him to report. Hence, a contract violation occurred when appellant's leave was cancelled.

Contrary to Letenyei's and the presiding official's position, Letenyei's leave was not cancelled before an operational emergency. Rather, he received *notice* on August 1 that his scheduled leave for August 2 was good, but that his leave on and after August 3 was cancelled as a result of the strike which had been called before August 1 to begin on August 3.[1] Letenyei does not dispute that the PATCO strike beginning August 3 created an operational emergency; indeed, his counsel agreed to stipulate to that fact. Moreover, he testified:

Q. Do you contend that Mr. Shallenberger didn't have the authority to cancel your leave when he called you on the first?

A. My understanding at the time was that in the case of a national emergency or an operational emergency, he did.

Q. But he only cancelled your leave as of August 3rd; correct?

A. Starting Monday, the 3rd, yes.

The board held that "the agency's *prospective* cancellation of appellant's leave *in anticipation* of the imminent and reasonably foreseeable operational emergency was proper, and did not constitute a viola-

tion of the applicable PATCO–FAA bargaining agreement." (Emphasis added).

I agree with this interpretation of the contract and the board's overturning the presiding official's imprecise analysis that Letenyei's leave was cancelled on August 1. The board's view is more fully explicated in *McPartland v. Department of Transportation, FAA,* Docket No. DA075281F1018 (MSPB Feb. 8, 1983), the lead case before the MSPB on this issue. Accordingly, it is appropriate to consider that decision.

In *McPartland,* the board noted that there is no language in the agreement "which addresses the question of notice in the event of cancellation of leave." Thus, a requirement of reasonable notice is appropriately implied. I fail to see that notice on August 3 to cancel leave August 3, which Letenyei admits would have prompted him to return, is more reasonable than notice on August 1 to report August 3. Simply stating the proposition indicates its hollowness.

Further, whatever may have been Letenyei's belief on August 1st and 2nd about his leave situation, his admissions establish that for the dates of August 3 to August 15, 1981, he had no reasonable basis for believing he could properly remain on leave. Letenyei does not assert that it was impossible to return during that period. On the contrary, in his oral response he admitted that "in a national emergency [his vacation plans] could be changed." The record establishes that he completed the major part of his move by Sunday evening, August 2, and that he remained in the area until August 11, and that because he wanted to rest after the move, he drove his family to visit relatives in Chicago for 3 or 4 days. Letenyei made his own decision on the law and now relies on his erroneous view to claim that he could not have had an intent to strike. Yet at no time did he protest the action of his supervisor, ask for the "day or two" he needed to complete

---

1. PATCO National President Robert E. Poli had announced at a press conference several days before August 1 that "... the strike will begin on the day shift of Monday, August the 3rd." (*See* MSPB *Letenyei* decision, n. 5).

settlement on his house, alert anyone that he would not appear for his shift, or otherwise act in any way except as a striker. Shielded by his now professed lack of support for the strike, he claims that it is no evidence of striking that he frequently "stopped" by the picket line for "no more than ten minutes" and was at the rally for the countdown to the Presidential deadline at PATCO headquarters on August 5. These are facts he admitted, not merely hearsay.

Letenyei acted with an utterly reckless disregard for his obligations to his employer and to the public. As he stated at his oral reply, he simply made the choice to continue his vacation because he did not expect people would be fired based on his experience at General Motors. There is no basis for treating him differently from other controllers whose leave was cancelled, for example, Russell S. Root. *See Campbell*, at 501–02. Root's absence during previously scheduled leave was deemed striking, although he also relied on the theory that his leave was improperly cancelled. The board was, therefore, equally justified in finding that Letenyei was on strike. His actions were more significant than his late declaration that he was not a striker. No direct evidence that he intended to strike is likely to be obtainable. Thus, the MSPB correctly looked to Letenyei's admitted availability; his admitted intentional withholding of services after a national emergency; his admitted stops at the picket line "a lot of times to find out what was happening;" and his admitted attendance at the PATCO countdown rally to the 11:00 o'clock deadline on August 5, 1981. His explanation that he "stayed only about five minutes" does not negate his admission to the hearing officer on August 28, 1981, that he attended. That was the evidence the agency relied on in effecting dismissal, and I would hold that it is substantial evidence of strike participation. Thus, under 5 U.S.C. § 7703(c), the agency's action cannot be held unlawful and set aside for failure of proof. The majority has simply failed to consider the whole record.

Our decision in *Schapansky v. Department of Transportation, FAA*, 735 F.2d 477 (Fed.Cir.1984), allocates the burden of going forward with evidence in such a way that Letenyei would be required to present evidence in his defense had the agency introduced only enough evidence to establish a prima facie case, that is, proof of a widespread strike of general knowledge, together with proof of absence without authorization or explanation to the agency. Letenyei's evidence to rebut strike participation was his testimony that he went ahead with his moving and vacation plans. That might rebut a mere prima facie case, which the majority apparently considers the agency's case here to be. What the majority fails to recognize is that the remainder of the government's evidence amply supports the board's conclusion that Letenyei did indeed refuse his services in concert with others.

The *Blount* case, cited by the majority both here and by the unanimous panel in *Schapansky*, notes that " 'Strike' is a term of ... common usage." 325 F.2d at 884. Accordingly, in this case, the evidence recited above (in this dissent) substantially supports the agency's removal based on striking. Since it has not been taken into account in the majority's decision to remand, presumably the board is not excluded from relying on it in its decision on remand, perhaps stressing this evidence more than in its original opinion.

On remand, which the majority mandates, the agency should be permitted to show that removal was justified based solely on Letenyei's AWOL from August 3 to August 15 during a national emergency whether or not he was also a striker. A first offense of unauthorized absence of more than five consecutive scheduled workdays carries a penalty of from 5 days' suspension to removal. The presiding official limited the agency to proof up to August 6 despite the notice in which he was charged with striking and AWOL "beginning August 3." While a longer period of time than 7 days would have been necessary for reply had the agency relied only

on AWOL as the basis for removal, the reasonable belief of a crime, i.e., striking, justified a shortened notice period. On the other hand, all charges need not be sustained in order to uphold removal action. A lengthy AWOL, or a short AWOL coupled with insubordination in failing to obey a direct order, is entirely sufficient. Indeed, this court has upheld removal based on as little as 4 hours AWOL in *Villela v. Department of the Air Force*, 727 F.2d 1574 (Fed.Cir.1984).