**Wayne E. EASLEY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–252C.

United States Court of Federal Claims.

April 28, 1994.

Daniel C. Schroeder, Indianapolis, IN, for plaintiff.

Gerald M. Alexander, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, DC, for defendant. Lieutenant Colonel Nolon J. Benson

and Captain Flora Darpino, Dept. of the Army, of counsel.

## ORDER

ANDEWELT, Judge.

### I.

In this disability pay action, plaintiff, Wayne E. Easley, contests the decision of the United States Department of the Army (Army) to retire plaintiff with a 60 percent temporary disability rating and to place him on the Army's Temporary Disabled Retired List (TDRL). Plaintiff initially sustained an inferior myocardial infarction (a heart attack) and suffers from coronary artery disease. Based on this medical condition, plaintiff contends that he is entitled under Army Regulation 635–40, App. B, ¶ B–66(d)(1), to a 100 percent rather than a 60 percent disability rating. Plaintiff also contends that, at the time of his rating, his condition had sufficiently stabilized at the 100 percent disability level so that he should not have been placed on the TDRL.

Under 10 U.S.C. § 1216(d), the Secretary of the Army has the authority to determine a soldier's disability rating and to determine whether that soldier should be placed on the TDRL. *See also* 10 U.S.C. § 1202. Court review of such a determination is available, but under a deferential review standard. This court will overturn such determinations only if "the [plaintiff] shows by cogent and clearly convincing evidence that such determinations are arbitrary, capricious or not supported by substantial evidence." *Finn v. United States,* 212 Ct.Cl. 353, 356, 548 F.2d 340, 342 (1977) (quoting *Stephens v. United States,* 174 Ct.Cl. 365, 371–72, 358 F.2d 951, 954 (1966)). To enable the court to perform this important, albeit limited, review, it is necessary that the Army articulate the basis for its determinations with an appropriate degree of clarity. As explained in *Moon v. United States Dep't of Labor,* 727 F.2d 1315, 1318 (D.C.Cir.1984), "[w]e cannot determine whether an agency has acted correctly unless we are told what factors are important and why they are relevant. Therefore, an agency must provide a

reasoned explanation for its actions and articulate with some clarity the standards that governed its decision." *See also Letenyei v. Dep't of Transp.*, 735 F.2d 528, 533 (Fed.Cir. 1984).

■ Herein, the Army based its decision to assign plaintiff a 60 percent disability rating on three Army review board decisions. But these Physical Evaluation Board (PEB) decisions do not pass the test articulated in *Moon* because they do not explain "what factors are important and why they are relevant." The Army's decision to give plaintiff a 60 percent disability rating is directly at odds with the medical evaluation provided by Dr. Gary J. Collins, Major, United States Air Force Medical Corps, the physician who apparently was most familiar with plaintiff's medical condition. Yet, the PEB decisions never mention the pertinent parts of Dr. Collins' evaluation and do not explain the medical or legal reasons why the PEBs did not follow that evaluation. Given this lack of explanation, this court simply cannot assess whether the Army's grant of a 60 percent disability rating was arbitrary, capricious, or not supported by substantial evidence. Hence, the court must remand this action pursuant to 28 U.S.C. § 1491(a)(2) to permit the Army to explain more fully the reasoning that underlies its decision.

## II.

Under Department of Defense Directive (DODD) 1332.18, ¶ D.5(b), after a soldier has been deemed medically unfit for active military service, he or she must then be assigned a disability rating consistent with the Veterans Administration's standard schedule of rating disabilities. DODD 1332.18 (Encl. 4), which contains a set of guidelines for the assignment of such disability ratings, provides the following distinctions between a 100 percent and a 60 percent disability rating:

*7005–7006. Arteriosclerotic Heart Disease, Myocardial Infarction.*

\* \* \* \* \* \*

c. In assigning percentages under these codes the criteria are as follows:

(1) *The 100 percent rating.* Following a myocardial infarction in which complica-

tions are so severe (i.e., intractable angina or intractable congestive heart failure) as to generally confine the individual to his home or comparable environment.

(2) *The 60 percent rating.* Following a myocardial infarction with substantiated repeated attacks of angina pectoris at rest or with normal activity. Also, substantiated repeated attacks of angina pectoris without antecedent myocardial infarction. More than light manual labor is precluded. . . .

The Army has issued its own interpretive regulations for applying these rating criteria. With regard to heart disease, Army Regulation 635–40, App. B, provides, in pertinent part:

B–66. 7005–7017—Disease of the coronary arteries, surgical procedures, and trauma

\* \* \* \* \* \*

d. Assign ratings using the following criteria:

(1) 100 percent. When more than sedentary employment is precluded.

(2) 60 percent. When more than light manual labor is precluded as indicated by a N.Y. functional class III heart or by congestive heart failure as established by a left ventricle ejection fraction reading of less than 24 or when the ejection fraction falls 5 or more from a level of 35 during exercise.

Hence, under Army Regulation 635–40, App. B, a soldier's disability rating depends upon the impact that heart disease has had on the soldier's ability to perform work. A 100 percent disability rating is warranted where "more than sedentary employment is precluded." Paragraph B–66(e)(1) defines sedentary work as "work that is not time dependent." A 60 percent rating is appropriate where the soldier is not limited to sedentary employment but can perform "light manual labor," which is defined in Paragraph B–66(e)(2) as " 'bench work' equivalents." In the instant case, pursuant to Army Regulation 635–40, App. B–66, the proper focus for the PEBs, and thus for this court, is whether plaintiff's heart condition precluded him from "more than sedentary employment," or

whether, instead, plaintiff was capable of "light manual labor."

### III.

To place Dr. Collins' evaluation in context, it is appropriate first to review plaintiff's medical history. Plaintiff suffered a heart attack in May 1990, and later developed post infarction angina pectoris.[1] Thereafter, plaintiff underwent cardiac catheterization,[2] which revealed three blocked coronary arteries, followed by triple by-pass surgery.

Following plaintiff's by-pass surgery, Dr. Collins authored a series of reports evaluating plaintiff's health. In a September 6, 1991, report, Dr. Collins noted that plaintiff had "exercised 9 minutes on Bruce protocol to a heart rate of 100% predicted for age" and that plaintiff could manage walking, swimming, or bicycling. Later reports by Dr. Collins indicate that plaintiff's health subsequently deteriorated. In a November 8, 1991, report, Dr. Collins noted that two of the three grafts performed during plaintiff's triple by-pass surgery had occluded and that plaintiff had been "having progressive chest pain occurring at rest and with exertion." Dr. Collins classified plaintiff's heart disease at that time as Class 3–4, but noted that medication reduced the symptoms to approximately Class 3.[3] Dr. Collins later brought his medical evaluation up to date in an April 1, 1992, report directed to the president of the PEB that was considering plaintiff's case at the time. Dr. Collins stated in this update that despite medical therapy, plaintiff was experiencing chest pain with minimal exertion or at rest and that plaintiff's disease should then be classified as Class 3–4 angina. Commenting on plaintiff's ability to work, Dr. Collins concluded that plaintiff should be "precluded from more than sedentary employment," thus employing the Army's formulation for the standard for a 100 percent disability rating, Army Regulation 635–40, App. B, ¶ B–66(d)(1). Dr. Collins wrote:

> At this time I feel that Lt. Col. Easley is disabled from his angina in that he cannot perform manual labor, *i.e.*, lawn mowing, and that he should be precluded from more than sedentary employment. I also feel that if at all possible, he should not be placed under stressful situations as this easily provokes his angina.

### IV.

As provided in Army Regulation 635–40, plaintiff was evaluated by three PEBs—an informal PEB, a formal PEB, and a PEB in Washington, D.C., respectively. In addition, plaintiff's condition was considered by the United States Army Physical Disability Agency (USAPDA). Both the Washington PEB and the USAPDA, without opinion, affirmed the findings of the formal PEB, which had affirmed the findings of the informal PEB. Thus, the proper focus for this court is the formal PEB's recommendation to retire plaintiff with a 60 percent disability rating and to place plaintiff on the TDRL.

The formal PEB based its recommendation in part on a hearing it held on April 29, 1992, at which plaintiff testified as to his current health and capacity for work. During that hearing, plaintiff testified that he had reported to work for "maybe one or two hours" in the prior month at the request of his command to assist in solving computer problems or to sign papers. Plaintiff stated that he had trouble getting to work because the stress caused by driving in traffic required him to pull over and take nitroglycerin tab-

---

1. Angina pectoris is a "[s]evere paroxysmal chest pain associated with an insufficient supply of blood to the heart." *Webster's II New Riverside University Dictionary* 107 (1984).

2. Cardiac catheterization involves a "passage of a small catheter through a vein in an arm or leg or the neck and into the heart, permitting the securing of blood samples, determination of intracardiac pressure, and detection of cardiac anomalies." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 110 (1992 Supp.).

3. The New York Heart Association has established four classes of heart disease according to the extent of a patient's functional capacity. Class 3 heart disease involves "[m]arked limitation of physical activity. Comfortable at rest, but less than ordinary physical activity causes fatigue, palpitation, dyspnea, or anginal pain." A patient with Class 4 heart disease is "[u]nable to carry on any physical activity without discomfort. Symptoms of cardiac insufficiency or of the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort is increased."

lets. Plaintiff also testified that he was unable to do any housework and his daily activities consisted primarily of eating, reading, watching television, occasionally answering the telephone, napping, and talking with his family. Plaintiff stated that as part of his cardiac rehabilitation program, he walked on a treadmill for 15 minutes three times a week and that he could not walk any further without experiencing pain. He stated that this rehabilitation program was designed strictly to make him more comfortable and to prevent muscle atrophy, and not to improve his underlying heart condition. Plaintiff further testified that he had been advised by his doctors that no treatment was available to improve his condition.

At the close of the hearing, the formal PEB issued oral findings. The formal PEB appeared to agree with Dr. Collins' April 1, 1992, evaluation of plaintiff's ability to work. *Inter alia,* the formal PEB stated: "The preponderance of the evidence convinces the board that ... [plaintiff] cannot perform duties greater than sedentary work...." Although such a finding would require a 100 percent disability rating under Army Regulation 635–40, App. B, ¶ B–66(d)(1), the formal PEB granted plaintiff only a 60 percent disability rating in its oral findings. The formal PEB later addressed this apparent inconsistency when it issued written findings. In those findings, the formal PEB changed its conclusion as to plaintiff's capacity to perform work and stated that plaintiff could not "perform duties greater than light manual labor," which is the standard for a 60 percent disability rating under Army Regulation 635–40, App. B, ¶ B–66(d)(2). While the formal PEB's written findings rely upon essentially the same facts as its oral findings, the formal PEB never explained why it changed its conclusion as to plaintiff's capacity to perform work.

In a subsequent letter to plaintiff, the Washington PEB provided the most direct articulation of the formal PEB's basis for assigning plaintiff a 60 percent disability rating. The Washington PEB stated:

The [formal PEB] made the recommendation of 60% because the medical evidence indicates that your exercise tolerance is increasing with therapy; you are working at home; you are capable of performing most of the activities of daily living; your left ventricle ejection fracture is 55%, and you can exercise for nine minutes on the Bruce Protocol with 100% heart rate for your age.

This explanation, however, is not sufficient to permit court review because it does not explain the relationship between the medical facts and the standards contained in the regulations. As explained above, the crucial question under the controlling Army regulations is whether plaintiff was capable of "light manual labor." But neither the formal PEB nor the Washington PEB explained why the stated facts suggest that plaintiff was capable. The court therefore is not able to assess whether the Army's ultimate conclusion is consistent with the record before it.

For example, the fact that plaintiff's exercise tolerance had increased over time would not necessarily mean that plaintiff could perform light manual labor. Even assuming there is a direct relationship between capacity to work and exercise tolerance, an individual's capacity to perform light manual labor would not depend upon the mere fact that the individual's exercise tolerance had increased but rather on the level to which it had increased. The formal PEB's findings do not correlate plaintiff's actual level of exercise tolerance to his capacity to perform work. Next, the formal PEB's reliance upon plaintiff having been able to exercise for nine minutes on the Bruce protocol is similarly without adequate explanation. The reference to the Bruce protocol apparently refers to a test that occurred well before the determination was made that two of the three grafts performed during plaintiff's triple bypass surgery had failed. It is not apparent to the court that the results of that test necessarily should be presumed to remain constant while plaintiff's health deteriorated. Moreover, even if such a presumption were appropriate, the formal PEB never explained the extent to which the Bruce protocol numbers correlate to plaintiff's capacity to perform light manual labor. In this regard, Dr. Collins apparently considered the same Bruce protocol numbers and found them in-

sufficient to support a conclusion that plaintiff could perform light manual labor.

As to plaintiff's left ventricle ejection fraction of 55 percent, that fraction is sufficiently high that based upon that fraction alone, plaintiff could not qualify for a 60 percent disability rating under Army Regulation 635–40, App. B, ¶ B–66(d)(2). (A fraction of 24 or less is required for a 60 percent rating.) But a low left ventricle ejection fraction is only one possible way to qualify for a 60 percent disability rating. Another way is to have a Class 3 heart condition. In his final report, Dr. Collins classified plaintiff as having a Class 3–4 heart condition, which indicates that plaintiff's heart was in poorer condition than required to qualify for a 60 percent disability rating. The formal PEB did not explain why this heart classification was insufficient to support a 100 percent disability rating. Similarly, the formal PEB's references to plaintiff working at home and being capable of performing "most of the activities of daily living" are ambiguous and were never related to the "light manual labor" standard. It is not apparent to which work at home the formal PEB was referring and why the formal PEB concluded that based on this evidence, plaintiff was capable of performing light manual labor. (Plaintiff's testimony during the hearing before the formal PEB suggests that plaintiff performed almost no work at home.) Also, it is not apparent why the ability to perform "most of the activities of daily living" could not also be consistent with a 100 percent disability rating.

Of most concern to the court is the formal PEB's unexplained failure to rely upon Dr. Collins' April 1, 1992, medical evaluation. While the formal PEB certainly had the authority to reject Dr. Collins' evaluation, it also was obliged to exercise that authority within the limits of the law, i.e., not to act arbitrarily or capriciously and to base its decision on substantial evidence. In this regard, the court has not concluded that the formal PEB's decision necessarily cannot be

sustained. The formal PEB possibly could have concluded that Dr. Collins had misinterpreted the medical data or had misapplied the criteria set forth in the controlling regulations. For example, the formal PEB might have concluded that Dr. Collins improperly relied upon plaintiff's self-serving testimony and instead should have relied upon the objective evidence including the Bruce protocol results and the left ventricle ejection test. The point of this court's order, however, is that to date, the formal PEB has not explained why it rejected Dr. Collins' evaluation and why, for example, it believed that the medical test results would support a conclusion that plaintiff is capable of light manual labor. Without such explanation, the court is simply not in a position to perform its review function.

The court recognizes that the instant case potentially involves consideration of complex medical issues concerning the effect of coronary artery disease and the meaning of certain medical test results. But Congress gave this court the responsibility to review any dispute as to such issues and for this court to perform its assigned role here, it necessarily is incumbent on the formal PEB to explain the rationale that underlies its decision in sufficient detail for a lay court to evaluate that rationale. In this regard, it is significant that this is not a case where the record contains conflicting physician evaluations and the formal PEB chose to rely upon one expert evaluation rather than the other. Defendant has not pointed to any physician's statement in the record that expresses an opinion as to plaintiff's capacity to perform work that is contrary to the opinion of Dr. Collins. In this setting, until the formal PEB explains in greater detail its medical and legal reasons for rejecting Dr. Collins' evaluation, this court is not in a position to determine whether the Army's determinations as to plaintiff's disability rating were arbitrary, capricious, or unsupported by substantial evidence.[4]

4. Indeed, there is some suggestion that the formal PEB may have relied upon an incorrect standard. In a letter to plaintiff's congressman, the Army's Physical Disability Agency defended the government's assignment of a 60 percent disability rating on the grounds that "[i]n order to be rated at 100 percent a soldier must be so impaired that activity levels are so restricted that the individual is capable of little more than self care." But this does not seem accurately to follow Army Regulation 635–40, App. B–66. It would seem that an individual may be precluded

## V.

One final point requires mention. Plaintiff challenges his placement on the TDRL on the ground that his condition will only get worse and he is therefore totally and permanently disabled. While the evidence before the court would seem to suggest that plaintiff's condition is somewhat unstable, the formal PEB stated its rationale for placing plaintiff on the TDRL in a conclusory fashion. It did not state the medical basis for its conclusion that plaintiff's condition is too unstable to be considered "of a permanent nature" under 10 U.S.C. § 1201. Therefore, the Army shall take this opportunity on remand also to explain in greater detail the factors upon which it relied in placing plaintiff on the TDRL and its reasons for relying on those factors.

### Conclusion

For the reasons set forth above, this action is remanded pursuant to RCFC 60.1 to the Secretary of the Army for further consideration. On or before July 15, 1994, the Secretary of the Army shall file with this court a decision on remand.

IT IS SO ORDERED.

from more than sedentary employment even though the individual was capable of activities beyond mere self care.