**Salvatore GIOVE, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

No. 99–3159.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 31, 2000.

Jerre W. Dixon, Dixon and Snow, P.C., of Denver, Colorado, for petitioner.

Harold D. Lester, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for respondent. On the brief were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Kirk T. Manhardt, Assistant Director, and Lara Levinson, Attorney.

Before BRYSON, GAJARSA, and LINN, Circuit Judges.

LINN, Circuit Judge.

Salvatore Giove seeks review of an arbitrator's decision in grievance number NM–98–GJT–02, denying Giove's grievance and

thereby upholding his removal from the Federal Aviation Administration ("FAA"), an agency of the Department of Transportation ("DOT"). Because the arbitrator's decision is in accordance with law and supported by substantial evidence, we affirm.

## BACKGROUND

Giove began working as an air traffic controller with the FAA in 1986. In October 1992, while Giove was not on duty, a plane crash occurred in the area served by the Grand Junction, Colorado control tower where he worked. Giove suspected that the controllers might have failed to advise the pilot of the contents of a Notice to Airmen ("NOTAM") posted at one of the consoles in the tower, and that such a failure might have had something to do with the plane crash. Giove assumed that the NOTAM was still in effect. A NOTAM is a published notice containing information for a specified airport and any pilot flying to that airport is expected to be familiar with the NOTAM.

The record reveals, and the arbitrator found, that this particular NOTAM informed pilots not to fix their position with their distance measuring equipment as they approached the Grand Junction airport. However, Giove admits that he did not know exactly what this NOTAM meant. To rectify his ignorance, Giove alleges that within one to three months after the crash he asked several of his co-workers and his manager what the NOTAM meant but that they were unable to tell him; however, the arbitrator did not believe that Giove sought this input from others. Giove also alleges that, several days after asking his manager what the NOTAM meant, he saw his manager remove the NOTAM. The arbitrator made no finding regarding this assertion by Giove, but noted that Giove acknowledged that he did not know what his manager did with the NOTAM thereafter. The record also reveals that the manager regularly removed NOTAMs that were out of date.

After the alleged removal of the NOTAM but still within the one to three month period after the crash, Giove called Cooling & Herbers, a law firm involved in the litigation over the plane crash, and anonymously informed them of the NOTAM and his understanding of its meaning. Giove followed his phone call up by typing some of the information from the NOTAM and mailing that extraction, along with an actual copy of the NOTAM, to Cooling & Herbers. He also drafted and mailed a letter explaining his understanding of the NOTAM and the NOTAM's origin. All of Giove's contact with Cooling & Herbers occurred within one to three months of the crash.

Approximately four and one-half years after the crash, a trial court determined that the crash had been caused by pilot error. After hearing about the trial's outcome, Giove began making inquiries. In or around May 1997, Giove, again acting anonymously, called Alpine Air, which is the manufacturer of the plane, and Cooling & Herbers, and discovered that neither of them were still involved in the litigation. The record reveals, and the arbitrator found, that in his phone call to Alpine Air, Giove accused the FAA of destroying the NOTAM in an effort to conceal it. Around the same time, Giove anonymously called Magana, Cathcart & McCarthy, the plaintiff's law firm, and informed it of the NOTAM. The record also shows that Cooling & Herbers sent to Magana, Cathcart & McCarthy the information and documents it had received from Giove in 1992–93.

After receiving this information, Magana, Cathcart & McCarthy filed a motion for a new trial. As a result of its further discovery, however, it determined that the NOTAM had been canceled prior to the accident, that the NOTAM was not a relevant factor in the accident, and that the FAA had not improperly destroyed information.

Magana, Cathcart & McCarthy's motion for a new trial alerted the FAA to the evidence that Giove had anonymously supplied. As a result, the FAA began its own inquiry to determine the accuracy of the

allegations. The record shows that the purposes of the inquiry included: (1) determining whether the NOTAM had in fact been posted at the tower and, if so, whether it was valid and in effect; (2) determining if the NOTAM had been removed or destroyed after the accident; and (3) determining who had provided the documents to Cooling & Herbers.

As these purposes reveal, the FAA's investigation at this time was at a preliminary stage. Although the disclosed information focused attention on the tower, the FAA was initially concerned with verifying the accuracy of that information. The arbitrator, characterizing the FAA's position, stated that the investigation was concerned with "identifying the documents and truth around the statements made regarding the ATC actions on the day of the crash."

The FAA assigned Special Agent Roberts to perform the inquiry, which involved, among other things, interviewing the controllers at the Grand Junction facility. On July 17, 1997, Special Agent Roberts interviewed Giove without advising him of any right to union representation. At that interview, Giove denied that he was the source of the anonymously sent information. The arbitrator found, and Giove does not deny, that the FAA had no individualized suspicion at the time of the interview that Giove was the source of the disclosures.

In addition to being interviewed by Special Agent Roberts, Giove and the other controllers were also deposed by Magana, Cathcart & McCarthy as part of the discovery related to the motion for a new trial. During Giove's deposition, in November 1997, Giove told the truth about his disclosures, admitting that he had anonymously sent the documents to Cooling & Herbers. All of the controllers, including Giove, had been informed of their right to have an attorney represent them during their depositions, and to have a union representative assist them in preparing for their depositions. Although Giove admits that he consulted two attor-

neys prior to the deposition, he chose not to be represented during the deposition.

In March 1998, the manager of the Grand Junction tower received a copy of Giove's deposition. The manager arranged a meeting with Giove to discuss the matter and to get Giove's side of the story. The manager told Giove that Giove was entitled to union representation or a lawyer at the meeting, but Giove declined both options. At the meeting, Giove did not deny lying during the interview conducted by Special Agent Roberts on July 17.

In August 1998, the FAA proposed removing Giove based on his actions in connection with the crash. The record reveals that the FAA provided Giove with several opportunities to respond to the FAA's proposal to remove him. Giove availed himself of these opportunities but he was, nevertheless, removed in September 1998. The removal was based on: (1) intentional falsification/concealment of a material fact in lying to Special Agent Roberts; (2) creating a disturbance to FAA personnel and operations by disclosing the information to Cooling & Herbers, Alpine Air, and Magana, Cathcart & McCarthy without going through proper channels; (3) misuse of government property, information, and records by disclosing the information and using a government computer to prepare the letters that were sent; and (4) a previous incident of unauthorized absence and deception regarding an alleged blood donation.

Giove challenged the removal by filing a grievance that was denied by the arbitrator in an opinion dated January 30, 1999. The arbitrator found that Giove's disclosures were not covered under the Whistleblower Protection Act because he did not have a reasonable belief that the information he disseminated was true. The arbitrator further found that Giove was not improperly denied representation during the interview with Special Agent Roberts. Giove appeals to this court for review of the arbitrator's decision. We have exclu-

sive appellate jurisdiction pursuant to 5 U.S.C. § 7121(f) (1994), 5 U.S.C.A. § 7703(b) (West 1996 & Supp.2000), and 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### A. Standard of Review

■ This court reviews decisions of arbitrators in grievances affecting federal employees under the same standard of review that is applied to decisions from the Merit Systems Protection Board. *See* 5 U.S.C. § 7121(f) (1994); *Cornelius v. Nutt,* 472 U.S. 648, 656, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985); *Frank v. Dep't of Transp.,* 35 F.3d 1554, 1556 (Fed.Cir.1994). That standard is deferential, requiring this court to affirm the decision of the arbitrator unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c)(1)-(3) (1994); *see also Hayes v. Dep't of the Navy,* 727 F.2d 1535, 1537 (Fed.Cir.1984). Substantial evidence is defined as "[t]he degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion even though other reasonable persons might disagree. This is a lower standard of proof than preponderance of the evidence." 5 C.F.R. § 1201.56(c)(1) (1999); *see also Consol. Edison Co. v. NLRB,* 305 U.S. 197, 217, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (stating that substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); *Frederick v. Dep't of Justice,* 73 F.3d 349, 352 (Fed.Cir.1996) (citing *Consol. Edison* ).

### B. Analysis

#### 1. Whistleblower Protection Act

In the grievance, the union argued on behalf of Giove that Giove's disclosures were protected under the Whistleblower Protection Act. In order for an employee's disclosure to be protected, the employee must reasonably believe that the disclosed information evidences a violation of law, rule, regulation, gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. *See* 5 U.S.C. § 2302(b)(8)(A)(i)-(ii) (1994). The union claimed that Giove was concerned about public safety, that he believed that the NOTAM indicated a failing on the part of the FAA, and that he had a reasonable belief that the information he disseminated was true and accurate. The arbitrator found, however, that Giove's disclosures were not protected under the Whistleblower Protection Act because Giove's belief in the significance of the information he disseminated was not reasonable.

In this appeal, Giove argues that there was not substantial evidence to support the arbitrator's decision that his belief was unreasonable. Giove contends that the evidence shows he had a reasonable belief that the NOTAM was both violated and relevant to the crash and that the manager tried to conceal these facts. The FAA responds that Giove had no basis for these beliefs and that substantial evidence supports the arbitrator's findings.

■ We agree with the FAA that substantial evidence supports the arbitrator's findings. As Giove admits, the test for whether a belief is reasonable is an objective one. *See LaChance v. White,* 174 F.3d 1378, 1381 (Fed.Cir.1999) ("A purely subjective perspective of an employee is not sufficient even if shared by other employees."). "[T]he proper test is this: could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence" one of the violations specified by the Whistleblower Protection Act? *Id.* Although the arbitrator did not explicitly refer to this "disinterested observer" test, the arbitrator's findings reveal that an objective standard was applied. Any error in the selection of tests by the arbitrator is, in this case, harmless.

*See* 28 U.S.C. § 2111 (1994) (directing appellate courts to disregard harmless errors that "do not affect the substantial rights of the parties"); *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1021, 226 USPQ 881, 884 (Fed.Cir.1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 50 USPQ2d 1672 (Fed.Cir.1999) (*en banc* ); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 859 F.2d 878, 892, 8 USPQ2d 1468, 1480 (Fed.Cir.1988).

█ Specifically, the arbitrator found that Giove's belief regarding the import of the NOTAM was unreasonable because Giove: (1) did not know what the NOTAM meant; (2) made no significant attempt to find out what the NOTAM meant, either initially or during the four years between his disclosures; and (3) did not know the effective date of the NOTAM. The record shows that Giove admitted that he did not initially know what the NOTAM meant and that his only alleged attempt to find out what it meant was to ask a few coworkers and his manager, which proved unsuccessful. The record also shows that the NOTAM was no longer in effect at the time of the plane crash and that Giove merely assumed that the NOTAM was still valid. Thus, the record reveals that Giove disclosed the contents of the NOTAM without knowing what the NOTAM meant or if it was still valid. This constitutes substantial evidence that "a disinterested observer with knowledge of the essential facts known" by Giove would not have concluded that the NOTAM was violated or relevant to the crash; hence, Giove's beliefs to the contrary were unreasonable.

█ The arbitrator also found that Giove's belief in an FAA cover-up was unreasonable because: (1) Giove had no idea what his manager did with the NOTAM after removing it; (2) the manager waited between one and three months after the crash before removing the NOTAM; and (3) Giove had no proof of a cover-up. The record shows that the manager regularly removed outdated NOTAMs, that the manager did not remove the NOTAM in question until at least one month after the crash, and that Giove did not know what the manager did with the NOTAM after removing it. This constitutes substantial evidence that "a disinterested observer with knowledge of the essential facts known" by Giove would not have concluded that the manager was trying to conceal the NOTAM and, hence, that Giove's beliefs to the contrary were unreasonable.

█ Giove's urging of this court to overlook the findings of the arbitrator and to find anew the reasonableness of Giove's beliefs on the record before us is unavailing and inappropriate. Our standard of review "is not what the court would believe on a *de novo* appraisal, but whether the [arbitrator's] determination is supported by substantial evidence on the record as a whole." *Brewer v. United States Postal Serv.,* 227 Ct.Cl. 276, 647 F.2d 1093, 1096 (Ct.Cl.1981). Because the arbitrator's findings are supported by substantial evidence, we cannot overturn them.

The FAA also argues that Giove's disclosure was specifically prohibited by 49 C.F.R. § 9.5 and, therefore, the protections of the Whistleblower Protection Act cannot be invoked. *See* 5 U.S.C. § 2302(b)(8)(A) (1994). In view of our conclusions regarding the evidentiary support for the arbitrator's findings of the unreasonableness of Giove's asserted beliefs, we need not and do not address this additional argument.

## 2. Right to Union Representation

In the grievance, the union contended that Giove's rights to representation were violated and that these violations resulted in Giove's lying to Special Agent Roberts. Specifically, the union asserted that under Article 6 of the Collective Bargaining Agreement ("CBA") between the FAA and the controllers, Giove should have been afforded representation: (a) during the interview with Special Agent Roberts; (b) during the deposition with the attorneys from Magana, Cathcart & McCarthy; and

(c) in subsequent meetings with FAA management that had the potential of resulting in discipline. The union claimed that with union representation during the interview, Giove would have been counseled to tell the truth and would have followed that advice. The union also claimed that the FAA further erred by not stopping the deposition and providing representation to Giove when it became clear that Giove had lied to Special Agent Roberts.

The arbitrator found that the FAA did not commit error because Giove had no right to union representation at the interview with Special Agent Roberts. The arbitrator based her decision on the preliminary nature of the FAA investigation at the time of the interview and its generality. The arbitrator noted that Giove was not being investigated because no one, except Giove, knew the identity of the source of the disclosures. The arbitrator further found that because Giove was given an opportunity to seek representation before both the deposition and the meeting with his manager, there was no FAA error.

In this appeal, Giove argues that the arbitrator improperly interpreted or applied Article 6, Section 1 of the CBA and that this was a harmful error. Giove argues that the interview with Special Agent Roberts was a meeting regarding a "potential disciplinary situation" and that, accordingly, Article 6, Section 1 of the CBA provided him a right to be notified of his right to union representation at the interview and required the FAA to advise him of that right. *See Agreement Between the National Air Traffic Controllers Association, MEBA/AFL–CIO and the Federal Aviation Administration, Department of Transportation,* August 1993, at 12 (Article 6, Section 1) (*"CBA"*). In support of his argument that the interview concerned a potential disciplinary situation, Giove maintains that the purpose of the FAA investigation was to determine the source of the disclosures and that the FAA considered the disclosures to be subject to discipline as a violation of 49 C.F.R. § 9.5, which broadly prohibits DOT employees from disclosing job-related material or information relating thereto. In support of his argument that this alleged error was harmful, Giove maintains that a union representative would have counseled him to tell the truth and he would have heeded that advice. Thus, the lie upon which Giove's removal was based, in part, would not have occurred.

The FAA responds that the interview did not concern a potential disciplinary situation because it did not result from individualized suspicion of Giove. Thus, according to the FAA, Article 6, Section 1 of the CBA does not apply and no right to union representation existed. Further, the FAA argues that in order to show harm arising from the failure to provide notice of union representation, Giove must make two assumptions, neither of which are supported by the evidence. First, Giove must assume that once notified, he would have requested union representation, even though he did not request it before the deposition or the meeting with the manager of the Grand Junction tower. Second, Giove must assume that he would have been truthful, even though he had previously deceived his supervisor regarding an unauthorized absence.

The CBA is a contract and the interpretation of a contract is a matter of law that this court reviews without deference. *See Muniz v. United States,* 972 F.2d 1304, 1309 (Fed.Cir.1992); *see also Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed.Cir.1998); *Mays v. United States Postal Serv.,* 995 F.2d 1056, 1059 (Fed.Cir.1993). In interpreting a contract, "[w]e begin with the plain language." *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris,* 142 F.3d at 1467. In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee,* 97 F.3d at 1435. Further, "[b]usiness contracts must be construed with business

sense, as they naturally would be understood by intelligent men of affairs." *N. German Lloyd v. Guar. Trust Co.*, 244 U.S. 12, 24, 37 S.Ct. 490, 61, L.Ed. 960 (1917); *Deloro Smelting & Refining Co. v. United States*, 161 Ct.Cl. 489, 317 F.2d 382, 387 (Ct.Cl.1963) (quoting *N. German Lloyd*, 244 U.S. at 24, 37 S.Ct. 490). If terms are "susceptible of more than one reasonable interpretation," then they are ambiguous. *McAbee*, 97 F.3d at 1435. However, for there to be an ambiguity both interpretations must be reasonable. *See Metric Constructors Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed.Cir.1999).

 Article 6, Section 1 of the CBA provides in relevant part:

> *When it is known in advance that the subject of a meeting is to discuss or investigate a disciplinary, or potential disciplinary situation,* the employee shall be so notified of the subject matter in advance. The employee shall also be notified of his/her right to be accompanied by a Union representative.... If during the course of a meeting it becomes apparent for the first time that discipline or potential discipline could arise, the Employer shall stop the meeting and inform the employee of his/her right to representation if he/she so desires, and provide a reasonable opportunity to both obtain representation and confer *confidentially* before proceeding with the meeting, if requested....

*CBA* at 12–13 (emphasis added).* As explained, the parties' disagreement centers on the interpretation of "potential disciplinary situation."

As stated above, we begin with the plain language of the contract. To "give[ ] meaning to all of [the contract's] provisions," we look to the entire contract. *McAbee*, 97 F.3d at 1435. Although the CBA contains eighty-eight articles, none of the other eighty-seven articles in the contract impact the interpretation of Article 6.

Thus we focus our attention on the language of Article 6 itself, which contains five sections. We begin with Section 1.

Section 1 relates to meetings with an individual employee where a "disciplinary[ ] or potential disciplinary situation" is to be discussed, whether the subject of the meeting is known beforehand or only becomes clear during the meeting. The language requiring a "disciplinary[ ] or potential disciplinary situation" is, admittedly, not clear on its face. For example, it could be interpreted narrowly to require proof of misconduct by a specific employee, or more broadly to require only suspicion of misconduct without evidence that an employee was responsible. However, as explained below, only one interpretation appears reasonable to this court.

It is reasonable to conclude that the Section 1 notification of representation rights is not triggered during a general background investigation or preliminary investigation in which the FAA is gathering facts or investigating accusations. Only when the FAA has sufficient evidence to indicate that a disciplinary or potential disciplinary situation exists and to suspect one or more particular employees of committing the misconduct would union involvement be appropriate. A more expansive interpretation would require managers to provide a notification anytime an agency problem, arguably a potential disciplinary situation, was discussed with even unsuspected employees, because some employee present might have been involved. Such an expansive interpretation would hinder problem-resolution, inhibit interaction between management and union members, and unduly constrain the FAA in its responsibility to manage its work and its employees. It would also frustrate the FAA's ability to perform background investigations and to follow up on accusations of wrongdoing.

---

* The 1993 version of the CBA was in effect during Giove's interview with Special Agent Roberts in July 1997. The 1993 version contained some terms modified by amendments made in 1995; however, Article 6 was not affected.

Thus, two requirements must be met before notice under Section 1 of the CBA must be given to an employee. First, there must be employee misconduct subject to disciplinary or potential disciplinary action. Second, the employee or employees at the meeting must be among those suspected by the FAA of committing the misconduct.

This court's decision in *Frank v. Dep't of Transp.*, 35 F.3d 1554 (Fed.Cir.1994) is consistent with our interpretation of Section 1. In *Frank*, an employee was removed for submitting an adulterated urine specimen. *See id.* at 1556. As with this case, the employee contended that his right to notification of union representation had been violated at an investigatory meeting by the FAA. *See id.* at 1559. The notification of union representation rights was conditioned, as in this case, on the existence of "a disciplinary, or potential disciplinary situation." *Id.* at 1559 n. 10 (quoting the collective bargaining agreement). The *Frank* court did not need to interpret that language, instead determining that any error on the part of the FAA was harmless. *See id.* at 1559. However, the employee in *Frank* would clearly have met the two requirements we have posited above. The employee had submitted a urine sample and the specimen collectors immediately observed that the temperature reading was sufficiently low to indicate that the specimen was not in fact urine. *See id.* at 1555. The specimen collectors then tested the temperature a second time and that test also indicated that the specimen was not urine. *See id.* Thus, the evidence clearly indicated employee misconduct subject to disciplinary action and Frank, the employee, was obviously suspected of that misconduct.

Our interpretation of Section 1 is also supported by the only other case we have found that actually interprets similar language. The Tenth Circuit interpreted language from an earlier collective bargaining agreement between the FAA and the controller's union providing that: "[n]o disciplinary action may result from a meeting between an employee and his supervisor and/or other management official unless the employee is advised that such meeting is for the purpose of discussing discipline or potential discipline, and the employee is allowed Union representation, if he so desires." *Giesler v. Merit Systems Protection Bd.*, 686 F.2d 844, 845 (10th Cir.1982).

In *Giesler*, an air traffic controller took sick leave to go hunting with a friend, in clear violation of the FAA's sick leave policy. *See id.* After the hunting trip was over, rumors of the infraction began to spread. *See id.* Giesler's supervisor informally confronted him, without advance warning and without a union representative, and Giesler denied having used sick leave to go hunting. *See id.* Giesler's supervisor then scheduled a more formal meeting at which Giesler did have a union representative, and Giesler again denied the accusation. *See id.* Only at a third meeting, again with a union representative present, did Giesler admit to the ruse. *See id.* The *Giesler* court held, however, that the controller had no right to union representation at the first meeting with his supervisor because of its "informal nature." *Id.* at 848. The *Giesler* court thus refused to impose unreasonable restrictions on the FAA supervisors.

We must also examine the remaining sections of Article 6 to ensure that our interpretation has not robbed them of meaning. *See McAbee*, 97 F.3d at 1435. Section 2 relates to interviews where criminal proceedings may result. Section 3 concerns formal discussions between the FAA and one or more employees about employment conditions. Section 4 provides that the meetings addressed by Section 1 and Section 3 can be conducted by telephone. Section 5 addresses the extent of the confidentiality between an employee and a union representative, and is not inconsistent with our interpretation of Section 1 as requiring notification of union representation only after an FAA investigation has proceeded beyond the initial stages to the point where certain employees are suspected of misconduct. Sections

2–5, therefore, are not affected by our interpretation of Section 1.

To summarize, Article 6 of the CBA is intended to strike a balance between the right and obligation of the agency to conduct investigations without unreasonable restrictions or encumbrances, and the right of each FAA employee to be notified in advance and provided with union representation before any discussion takes place regarding conduct for which the employee may be subjected to discipline. The CBA does not provide employees with a blanket right of union representation during any and all stages of FAA investigations. To the contrary, we hold that the terms of Article 6, Section 1 of the CBA are triggered only when an investigation has moved to the stage where: (1) employee misconduct subject to possible disciplinary action is discovered, and (2) the employee being questioned, or about to be questioned, is suspected by the FAA investigator to be among those who may have engaged in such misconduct. It is only at that point that the FAA becomes obligated to notify the employee of the employee's right to union representation before questioning may take place.

 We now review the arbitrator's decision in light of our interpretation of the CBA. The arbitrator found that Special Agent Roberts was investigating the facts and had not gathered enough evidence to confirm that any employee misconduct had occurred, much less to place Giove among those suspected of committing any misconduct. Specifically, the arbitrator found that at the time of Giove's interview with Special Agent Roberts "no one knew who sent the information to the plaintiffs attorney. Certainly the Grievant [Giove] knew, but, at that point he was the only one who did." The arbitrator also found that Special Agent Roberts' inquiry "was a general investigation" and that "[i]t wasn't [Giove] who was being investigated." These findings are supported by substantial evidence.

When Special Agent Roberts interviewed Giove, the investigation was still at a preliminary or background stage and the only information available was the contents of the disclosures received by Magana, Cathcart & McCarthy. These disclosures included evidence that the source of the information was familiar with tower instructions, operations, and protocol, but they did not provide enough information to allow the FAA to suspect an air traffic controller, or Giove in particular, of improperly disclosing that information. In particular, the record contains no evidence precluding a manager, a janitor, or even a visitor from obtaining much of the information that was disclosed. Further, the record contains no evidence precluding the possibility, at the time of Giove's interview with Special Agent Roberts, that much of the information was either publicly available (such as the NOTAM) or fabricated (such as the accusation of destroying the NOTAM). Special Agent Roberts admitted that his investigation was preliminary and that he needed to verify the accuracy of the disclosures. He specifically testified that part of his investigation was to determine whether the NOTAM had in fact been posted and, if so, whether it had been removed. The FAA also appears to have stated that the investigation was directed toward identifying the NOTAM and verifying the accuracy of the allegations.

Because the arbitrator's findings are supported by substantial evidence and reveal that neither of the two requirements of Section 1 were met, Giove did not have a right to notice under Section 1 of the CBA at the time of the interview with Special Agent Roberts. Therefore, we hold that the arbitrator's decision that Giove was not "denied representation in violation of ... the contract" is correct as a matter of law.

## CONCLUSION

The arbitrator's determinations that Giove's disclosures were not protected by the Whistleblower Protection Act and that Giove had no right to notification of union representation during the interview with Special Agent Roberts are in accordance

with law and supported by substantial evidence. Accordingly, we affirm the arbitrator's decision to uphold the removal of Giove.

*AFFIRMED.*