Agnes B. BULLOCK, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 03–3205.

United States Court of Appeals, Federal Circuit.

DECIDED: May 6, 2004.

Thomas E. Tierney, Jr., Principal Attorney, Brooklyn, NY, for Petitioner.

Agnes B. Bullock, of Counsel, Lakewood, NJ, pro se.

J. Reid Prouty, Heide L. Herrmann, Principal Attorney, Monica J. Palko, David M. Cohen, Deborah A. Bynum, of Counsel, Department of Justice, Washington, DC, for Respondent.

Before MICHEL, GAJARSA, and PROST, Circuit Judges.

PER CURIAM.

Agnes B. Bullock challenges an arbitrator's ruling that the Immigration and Nat-

uralization Service ("INS")[1] lawfully removed Bullock from her position as a criminal investigator, because she suffered from psychological conditions that rendered her unfit for service and could not be reasonably accommodated. *In the Matter of Arbitration Between AFGE Local 1917 and Immigration & Naturalization Service Employer*, March 13, 2003 ("*Arbitrator's Op.*"). We *affirm*.

## BACKGROUND

The following facts are uncontested:

## I. Circumstances Leading to Bullock's Removal

In September 1991, Bullock began her employment with the INS as a criminal investigator/special agent. Bullock was terminated in 1998 for allegedly lying under oath, but she was reinstated following an appeal to the Merit Systems Protection Board. Following her reinstatement, Bullock was assigned to an INS office at Rikers Island, New York.

At some point, Bullock filed a civil lawsuit against three Special Agents of the Department of Justice's Office of Inspector General. (The parties do not specify when the suit was filed or the nature of the complaint.) The case went to trial. On November 21, 2000, Bullock called as a witness her treating psychologist, Dr. Naftali Berrill. Dr. Berrill testified that Bullock was diagnosed with several psychological conditions. The trial was terminated when Bullock decided to drop the suit.

On December 4, 2000, counsel from the United States Attorney's Office notified the District Director of the INS's New York office of the testimony given by Dr.

Berrill regarding Bullock's psychological conditions. Counsel stated that

> we feel it is important to bring to your attention the fact that the trial raised serious concerns about the state of SA Black's[2] mental health. During the trial, SA Black offered the testimony of her treating psychologist, N.G. Berrill. Dr. Berrill's testimony is reflected at pages 770 to 812 of the attached trial transcripts. Dr. Berrill's examination of SA Black demonstrated that she has a tendency to confuse fantasy with reality. (Tr. 800) Moreover, Dr. Berrill diagnosed SA Black with a myriad of psychological conditions including major depression recurrent, adjustment disorder with anxiety and somatization disorder with prominent hypochrondriacal features, as well as a personality disorder with traits of someone with an avoidant personality disorder, a schizoid personality disorder and a self-defeating personality disorder.

*Arbitrator's Op.* at 3.

After receiving the letter, the District Director placed Bullock on paid administrative leave, and began an investigation into Bullock's mental health and its implications with respect to her fitness for service. Copies of Dr. Berrill's testimony along with certain of Bullock's medical records were sent to the INS's Medical Review Officer, Dr. Bruce M. Butler. After reviewing the records, Dr. Butler determined that

> [t]he testimony, medical documentation, current and past history identify several disorders that directly affect the ability of Ms. Black to provide useful and efficient service in the position of Criminal Investigator.

---

**1.** Pursuant to 6 U.S.C. § 291, the INS has been abolished, with its functions transferred to the Department of Homeland Security.

**2.** Bullock's maiden name was Black.

Furthermore, the identified medical/psychiatric conditions have an unacceptable safety risk in context to the duties and responsibilities of a Criminal Investigator. Given the duration of the existing disorders and the pathophysiology as confirmed in the prevailing medical literature, her conditions would not be expected to achieve a level of stability necessary to perform the full range of duties and responsibilities in the foreseeable future.

It is my opinion that Ms. Black is no longer capable of performing the full range of duties in a safe and efficient manner.

*Id.* at 3–4.

On November 13, 2001, the INS prepared a notice of proposed disciplinary action, namely, removal; Bullock received the notice in March 2002.[3] The notice gave three reasons for Bullock's removal, the first of which was her unfitness for service:

Reason 1—Inability to Perform

(1) Inability to perform her duties based upon her Axis I psychiatric conditions which included, major depression recurrent, severe without psychotic features, adjustment disorder with anxiety and somatization disorder with prominent hypochrondriacal features,

(2) Inability to perform her duties based upon her Axis II psychiatric condition, personality disorder not otherwise specified with traits of a schizoid personality, avoidant personality and self-defeating personality.

*Id.* at 4. The other two reasons for Bullock's removal were "conduct unbecoming an officer" and "insubordination"; the notice listed several allegations in support of these last two charges, including allegations that on two occasions Bullock had refused to sign certain documents as directed by her supervisor. *Id.* When, as described below, Bullock's removal went to arbitration, the INS relied on Bullock's alleged inability to perform as justification for her removal, although the INS presented evidence of conflicts between Bullock and her coworkers—including the two incidents involving Bullock's supervisor—as corroboration of Bullock's psychological conditions.

## II. Arbitration of Bullock's Removal

Bullock grieved her removal and invoked her right to arbitration. An arbitrator held a hearing on January 16–17, 2003, at which Bullock was represented by a union official. At the hearing, the arbitrator heard testimony from Dr. Butler (who wrote the report recommending Bullock's removal), the removal authority, a medical policy and personnel specialist, Bullock's direct supervisor (who testified that on two occasions Bullock had refused to sign documents as directed by him), and two of Bullock's coworkers (who testified as to interpersonal conflicts with Bullock). In addition, the arbitrator received evidence that included a transcript of Dr. Berrill's testimony from Bullock's earlier lawsuit, and certain of Bullock's medical records.

On March 13, 2003, the arbitrator issued a written decision in favor of the INS with respect to Bullock's removal. The arbitrator discussed the evidence, stating that

[i]n my review of the evidence, I note that the record contains exhibits and documents going back to the grievant's hospitalization in 1990. Those documents show that the grievant was admitted to the intensive care unit, a closed psychiatric unit, because [of] possible suicide. The evidence also disclosed

---

3. The parties did not explain the reason for the delay in Bullock's receipt of the notice.

that the grievant was treated and discharged 13 days later. As the documentation disclosed, the grievant was depressed because her husband left her.

The discharge summary indicates the grievant's discharge diagnosis as Axis I, major depression, recurrent and Axis II, dependent personality disorder.

The next evidence concerning the grievant's psychiatric condition concerned that the fact that the grievant was directed to attend "counseling" in or about 1997 in conjunction with some other lawsuit. . . .

[T]here was no evidence of other diagnoses, treatment or apparent psychological difficulties until the grievant's psychologist testified in her civil lawsuit on November 21, 2000.

As the evidence disclosed, the grievant (plaintiff) called her treating psychologist, Dr. Berrill, as a witness in that lawsuit. And, as noted above, it was his testimony that caused the Assistant U.S. Attorneys to notify the District Director of their concerns. . . .

Dr. Berrill testified that the grievant had a diagnosis of major depression, recurrent severe without psychotic factors, adjustment disorder with anxious mood, somatization disorder with prominent hypochrondriacal and a personality disorder, not otherwise specified.

In arriving at his opinions, Dr. Berrill relied on the fact that he had been treating the grievant since February 2000 and that he also reviewed psychological testing, including an MCMI–III interpretative report dated February 8, 2000. Dr. Berrill stated that the data showed that the grievant was experiencing a severe mental disorder and that in his opinion further professional observation and inpatient care might be appropriate.

Dr. Berrill testified that the testing confirmed his clinical observations and he felt that the testing was pretty accurate. . . .

In light of the grievant's past history of clinical depression including her hospitalization in 1990 and court ordered counseling in 1997, Dr. Berrill stated that it is pretty clear that the grievant *would be vulnerable, under certain conditions for the symptoms to reemerge.* . . .

As noted above, the Service requested assistance from its Medical Review Officer, Dr. Butler.

Dr. Butler noted that he received a myriad of materials including testimony from several witnesses in the aforementioned lawsuit. In this regard, he reviewed the testimony of witnesses and exhibits relating to the grievant's hospital confinement in 1990, the MCM–III interpretative report, and Dr. Berrill's testimony.

After completing his review, Dr. Butler found Dr. Berrill's conclusions consistent with the information that he reviewed. Dr. Butler concluded that the grievant's conditions are chronic and that they are still capable of producing aberrant behavior, i.e. excessive and inappropriate behavior. As such Dr. Butler concluded that the grievant was not fit to perform the duties as a criminal investigator or any other job at the INS.

After I reviewed and considered this evidence, I would agree that the *weight of this evidence* does create a *rebuttable presumption* that the grievant was incapable of performing the duties of a criminal investigator.

*Id.* at 22–24 (emphases in original). The arbitrator emphasized Dr. Berrill's testimony: "the testimony of *her* own physician as to her suffering from *major* depression, a *severe* adjustment disorder, and an *in-*

*flexible* and *long standing* personality disorder (Axis II) was pretty indicative that the grievant was *incapable* of performing the duties of her position." *Id.* at 25 (emphases in original).

The arbitrator found that Bullock had failed to overcome the evidence presented by the INS. Indeed, the arbitrator found that Bullock's union representative "presented no evidence from any health care professional to rebut the findings, the diagnoses and opinions of either Drs. Berrill or Butler. The only evidence proffered was the grievant's testimony that she did not have any disabling condition." *Id.* at 26. The arbitrator found Bullock's testimony insufficient: "I found that the evidence proffered by the Service was persuasive and that it does establish that retention of the grievant in the position of criminal investigator, a highly stressful and demanding position, would be inappropriate, notwithstanding the grievant's protestations to the contrary." *Id.*

Having determined that the INS had just cause for removal, the arbitrator turned to the question of whether the INS could have reasonably accommodated—within the meaning of the Americans With Disabilities Act ("ADA")—Bullock's psychological conditions, *e.g.*, by transferring her to another position:

> I must next turn to the union's arguments that the removal was improper and in violation of the ADA inasmuch as no accommodation was afforded the grievant.
>
> In this regard, I note that the union and the grievant have maintained throughout these proceedings, and before, that she is not suffering from any disability. Moreover, while the union did make a reference to possible accommodation, the evidence demonstrates that neither the union nor the grievant ever made a serious request. There was

no evidence of any request for a meeting to discuss possible accommodation or placement into other vacant positions. To the contrary, and as noted above, the union and the grievant consistently took the position that the grievant was perfectly well and that she was fully capable of performing her regular duties.

> While noting that the union never presented any evidence as to other positions the grievant could have performed, I note that there was affirmative evidence to the effect that given the grievant's diagnoses that she would be incapable of having performed in other positions, i.e. non law enforcement positions.
>
> In this regard, I note Dr. Butler's opinions based upon the grievant's continuing and long standing psychological condition, i.e., her long standing personality disorders. Moreover, the severity of symptoms as described by Dr. Berrill and the incidents [between Bullock and her coworkers] described in the charges also seemed consistent with Dr. Butler's conclusions to the effect that the grievant's mental condition was interfering even with the most routine interpersonal interactions.

*Id.* at 26–27. The arbitrator concluded that the INS "did meet the burden of proof in demonstrating that the grievant could not have been reasonably accommodated to positions outside of the criminal investigator assignment." *Id.* at 27.

## III. Bullock's Disability Claims

After the arbitrator's decision upholding her removal from the INS, Bullock filed disability claims with both the Social Security Administration ("SSA") and the Office of Personnel Management ("OPM"). Both claims were denied. In a notice dated September 30, 2003, the SSA stated that "[w]e have determined that your condition is not serious enough to be considered

disabling. In deciding this, we considered the medical records, your statements, and how your condition affects your ability to work." The medical reports considered by the SSA post-dated Bullock's arbitration. The SSA found that while Bullock has "occasional episodes of anxiety and depression," she had "no permanent mental disorder which would prevent [her] from doing normal daily activities" and that her "condition should not affect [her] ability to work."

The OPM denied Bullock's claim in a letter dated December 23, 2003. The OPM stated that although the arbitrator had found Bullock unable to perform because of psychological conditions, "for purposes of a disability retirement determination there is insufficient definitive medical evidence in the file to establish a disabling medical condition that prevents the performance of your essential duties or that will continue for at least one year from the date of your application for disability retirement." Unlike the SSA, the OPM considered evidence from Bullock's arbitration. The OPM found that

> [t]he medical evidence submitted in support of your claim fails to establish that your conditions are of a severity to prevent you from performing your essential duties. Your doctors did not give proof of your disability through objective medical findings or provide a continual history that would identify what exacerbated your condition in 1997. Reasonableness of accommodations or a reassignment cannot be determined due to the lack of conclusive medical findings and the lack of information from your former employer.

## DISCUSSION

Our court "reviews decisions of arbitrators in grievances affecting federal employees under the same standard of review that is applied to decisions from the Merit Systems Protection Board." *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1338 (Fed. Cir.2000) (citing 5 U.S.C. § 7121(f) (1994)). "That standard is deferential, requiring this court to affirm the decision of the arbitrator unless it is: '(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.'" *Id.* (citing 5 U.S.C. § 7703(c)(1)-(3) (1994)).

Bullock presses two principal arguments on appeal: (1) the arbitrator misapplied the standards of the ADA by "incorrectly rul[ing] that the burden was on the employee to prove that accommodation or reassignment to another position was possible," and (2) that the SSA's and OPM's denials of Bullock's disability claims "further demonstrate that the arbitrator misapplied the ADA by unfairly placing the burden of proving accommodation upon the employee." Bullock does not contest the arbitrator's finding that, without an accommodation, she was unfit for service.

■ Bullock's first argument mischaracterizes the arbitrator's decision. The arbitrator did not place on Bullock the burden of demonstrating availability of a position constituting a reasonable accommodation. To the contrary, the arbitrator appeared to place the burden on the INS, stating that the INS "did meet the burden of proof in demonstrating that the grievant could not have been reasonably accommodated to positions outside of the criminal investigator assignment." *Arbitrator's Op.* at 27. Bullock points to the arbitrator's observation that Bullock failed to request a reasonable accommodation; Bullock contends that the arbitrator based his decision in part on this failure, implicitly placing the onus on Bullock to request and show the availability of a reasonable accommodation.

But the observation Bullock points to is simply a recital of a contextual fact, and was not a ground for the arbitrator's decision. Indeed, the arbitrator never stated that Bullock bore any burden with respect to reasonable accommodation, nor did he state that allocation of the burden of proof to her was the basis for his decision. Instead, he explicitly stated that his decision was based on the *evidence:* the evidence presented by the INS that Bullock could not be reasonably accommodated, and the lack of any persuasive evidence that Bullock could be reasonably accommodated.

■ Bullock's second argument is also unavailing. The SSA's and OPM's disability-claim denials have no bearing on our current mission, which is to review the findings in the arbitrator's decision in light of the evidentiary record before the arbitrator. Moreover, the SSA's decision was based on entirely different evidence concerning a later period than was the arbitration. Our inquiry is limited to analyzing the arbitrator's decision under the appropriate standard of review, and under that deferential standard, the arbitrator's findings—which were plainly supported by substantial evidence—must be sustained.

Parenthetically, we note that the OPM's decision raises two questions. First, the decision states that the government "did not provide a supervisor's statement of disability or a certification of reassignment and accommodation efforts, citing ongoing litigation." The cited litigation is presumably the instant case. But this case should not have prevented the INS from acceding to an OPM request to provide a statement of disability and a certification that Bullock's disability could not be accommodated—indeed, the INS's position in this litigation is precisely that Bullock suffered from a disability that could not have been reasonably accommodated. The INS's failure to provide the requisite documentation appears to have undercut Bullock's disability claim; the OPM stated that "[r]easonableness of accommodations or a reassignment cannot be determined due to the lack of conclusive medical findings *and the lack of information from your former employer.*" (Emphasis added.) If Bullock files a new application, the government may want to reconsider its position on providing this information.

Second, the OPM's disability-claim denial appears to disregard the strength of the evidence presented at the arbitration that Bullock suffered from a psychological condition, which both rendered her unfit for service in her position as a criminal investigator and could not be reasonably accommodated.[4] Indeed, the contrast between the INS's decision to remove Bullock based on her disability and OPM's denial of Bullock's disability claim is stark. If Bullock files a new application, OPM may wish to take a fresh look at the evidence in

4. We also note that the OPM appears to have construed the arbitrator's decision as relying equally on three grounds: inability to perform, conduct unbecoming, and insubordination. But in fact, the ground for the arbitrator's decision was his determination that Bullock suffered from a disabling psychological condition that could not be reasonably accommodated. The evidence of "conduct unbecoming" and of "insubordination" played a subsidiary, nondeterminative role in the arbitrator's decision. Indeed, he seems to have relied on this evidence only for additional corroboration of Bullock's unfitness. Even there, this evidence was of limited influence on the arbitrator's analysis; as the arbitrator stated: "While the [INS] asserts that the incidents [between Bullock and her coworkers] do have a bearing on the grievant's mental condition as they corroborate the diagnoses in this case, the fact is that the *primary evidence* on the issue on the question of the grievant's mental condition involves the evidence and opinion of mental health care professionals, i.e. the doctors." *Arbitrator's Op.* at 22.

the arbitration record of Bullock's mental health impairment.

Finally, in her reply brief Bullock raises several challenges to specific factual findings made by the arbitrator. We have considered these challenges and believe that they do not establish error by the arbitrator.