NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-3150

GUS MEZA,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Denis P. McAllister, of Glen Cove, New York, argued for petitioner.

Allison Kidd-Miller, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director. Of counsel was Christopher L. Krafchek, Attorney. Of counsel on the brief was J. Douglas Whitaker, Administrative Law Attorney, Immigration and Customs Enforcement, United States Department of Homeland Security, of Omaha, Nebraska.

Appealed from: Merit Systems Protection Board

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-3150

GUS MEZA,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Petition for review of the Merit Systems Protection Board in DA0752060240-I-2

_____

DECIDED: April 23, 2008

_____

Before MICHEL, <u>Chief Judge</u>, GAJARSA, <u>Circuit Judge</u>, and YOUNG, <u>District Judge</u>.[*]

MICHEL, <u>Chief Judge</u>.

Petitioner Gus Meza ("Meza") appeals from a final decision of the Merit Systems Protection Board ("Board") affirming his removal by the Department of Homeland Security for testing positive for cocaine in a random drug test.  <u>Meza v. Department of Homeland Security</u>, No. DA-0752-06-0240-I-2 (M.S.P.B. Dec. 1, 2006).  Meza argues that he did not use cocaine and thus should not have been removed; he does not separately challenge the penalty of removal as disproportionate to the charge.  Because

_____
[*]    Honorable William G. Young, United States District Court for the District of Massachusetts, sitting by designation.

the Board's finding that Meza used cocaine is supported by substantial evidence, we must affirm.

BACKGROUND

Meza was a Border Patrol Agent with the Immigration and Naturalization Service ("INS") from 1985 to 1988. He became an INS Criminal Investigator / Special Agent in 1988, and then a Supervisory Criminal Investigator in 1999. In 2003, Meza's position was transferred from INS to the Bureau of Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS" or "the agency"). See Homeland Security Act of 2002, 6 U.S.C. § 111 et seq. DHS subjects certain employees, including Supervisory Criminal Investigators, to random drug testing conducted in accordance with guidelines promulgated by the Department of Health and Human Services ("HHS"). See Executive Order 12564, "Drug-Free Federal Workplace," 51 Fed. Reg. 32889 (Sept. 15, 1986).

*A. Meza's Positive Drug Test*

On September 19, 2005, Meza was randomly selected to take a same-day drug test. DHS contracted Houston Medical Testing Services to collect urine samples for drug testing, and Houston Medical employee Roger Avila collected samples on that day. Avila later testified before the Board about the collection procedures he regularly followed, including steps taken to confirm the identity of each urine donor and to ensure the integrity of the collection process, though Avila did not specifically recall taking Meza's sample. According to the Chain of Custody and Control Form submitted into evidence before the Board, Meza certified on September 19, 2005 that he provided an

unadulterated urine sample to Avila, and that in Meza's presence Avila sealed the sample in a specimen bottle labeled with an ID number corresponding to Meza.

Houston Medical shipped Meza's sealed urine sample to Northwest Toxicology, a Utah laboratory contracted by Houston Medical to perform drug testing. Ron Shearon, the Certifying Scientist at Northwest Toxicology, reported on September 21, 2005 that an aliquot of urine taken from Meza's sample tested positive for benzoylecgonine, a cocaine metabolite, in an immunoassay screening test. Shearon did not testify before the Board. However, Mulamootil George, a Regional Operations Director of Quest Diagnostic, a testing company that purchased Northwest Toxicology in August of 2005, testified that in September of 2005, Northwest Toxicology's sample handling procedures and equipment condition complied with HHS guidelines. George also testified that he reviewed the paperwork maintained by Northwest Toxicology for Meza's sample, and saw no discrepancies in the chain of custody.

After Northwest Toxicology tested Meza's urine, Meza was contacted by Dr. Deborah Mattingly, a Medical Review Officer. Dr. Mattingly told Meza that he had tested positive for cocaine, and Meza denied using cocaine but did not offer any explanation for the test result. To reconfirm the result obtained by Northwest Toxicology, a second aliquot of urine from Meza's sample was sent to El Sohly Laboratories in Oxford, Mississippi, where it was tested using Gas Chromatography / Mass Spectrometry ("GC/MS"), also yielding a positive result. According to Dr. Mattingly's expert testimony before the Board, GC/MS identifies the presence of benzoylecgonine with 100% certainty.

*B.    Meza's Efforts to Clear His Name*

Meza testified that upon being told by Dr. Mattingly that he had tested positive for cocaine, he assumed that an error had been made—stating that the positive result was "a big mistake" and "something to clear up."  Meza discussed the test result with his supervisor, who recommended that Meza have himself retested.  On September 30, 2005, Meza had his urine tested at Clinica Las Americas, a testing lab in Houston, and the results were negative.  A few days later, Meza had his urine tested again, at Wienhoff Drug Testing in Woodlands, Texas, and the results were again negative.

On October 19, 2005, DHS proposed to remove Meza from his position because of his September 19 positive urine test.  Meza retained a lawyer, who recommended that Meza have his hair follicles tested in addition to the two urine tests Meza had already commissioned.  The lawyer explained to Meza that because cocaine takes time to metabolize into hair, Meza should wait three weeks before commissioning a hair test, so that the test would be probative of whether there was cocaine in his system at the time of the September 19, 2005 positive urine test.

On October 31, 2005, Meza traveled to Compliance Testing Solutions in Woodlands, Texas, where samples of hair from his armpits were taken.  Compliance Testing Solutions sent the hair sample to ExperTox, Inc., a laboratory run by Dr. Ernest Lykissa.  Dr. Lykissa later testified at the Board hearing that Meza's hair sample was tested using immunoassay and GC/MS methods, and that both tests were negative for cocaine.

On November 8, 2005, Meza's attorney submitted a response to DHS's proposed removal of Meza, arguing that the two negative urine tests and the negative hair test, as

well as good-character affidavits from Meza's friends and colleagues, cast serious doubt on the positive results of the September 19, 2005 urine test. On November 12, 2005, Meza commissioned a polygraph exam by John Schwartz Polygraph Services in Houston. During the exam, Mr. Schwartz asked Meza whether he had possessed or used cocaine "prior to [the positive] urinalysis," and whether Meza had "ever used cocaine since beginning [his] employment with the Federal Government." Meza answered "no" to these questions, and Schwartz wrote in his "Report of Polygraph Examination" that "no physiological responses were present" during Meza's answers and thus there was "[n]o [d]eception [i]ndicated." Meza submitted the results of the polygraph test to DHS on November 15, 2005, when he gave an oral response to the proposed removal.

### C. Meza's Removal and Appeal to the Board

On January 6, 2006, ICE Acting Special Agent in Charge Robert Rutt sustained Meza's removal on the basis of the drug test charge, writing to Meza that "[w]hile your subsequent drug testing may show a negative drug result this does not alleviate the fact that on the initial random drug test you tested positive for cocaine." On January 25, 2006, Meza had his armpit hair tested again, this time submitting a sample to the TADTS clinic in Houston and having the testing done by Omega Labs in Indianapolis, Indiana. The results were again negative.

Meza appealed his removal to the Board on February 6, 2006, arguing that he had not used cocaine and that the penalty of removal was unreasonable under the circumstances. On May 11, 2006, Meza moved to compel DHS to provide him with an aliquot of the urine that had tested positive in September of 2005, so that Meza could

have the urine DNA-tested to show that the urine was not his. The Administrative Judge ("AJ") granted this motion on May 16, 2006. Because it appeared that the DNA testing would take some time, the AJ dismissed Meza's appeal without prejudice on June 20, 2006, with the proviso that the Board would refile the appeal sua sponte on August 4, 2006. The DNA tests were inconclusive—the laboratory tested the cocaine-positive urine 10 times but could not obtain a proper grade of DNA to compare to DNA from a sample of Meza's saliva—so Meza's appeal was refiled and proceeded to a hearing on September 18, 2006.

At the hearing, DHS called Avila (who had collected the September 19, 2005 urine sample from Meza), George (the Regional Operations Director of the testing lab's parent company), Dr. Mattingly (the Medical Review Officer who had informed Meza of the positive test), and Rutt (the Acting Special Agent in Charge who had decided to remove Meza). Meza testified on his own behalf, denying that he had used cocaine and recounting his efforts to clear his name. Meza also called Dr. Lykissa of ExperTox. Drs. Mattingly and Lykissa, in addition to their factual testimony, offered expert testimony on drug tests in general and on the likelihood that Meza's September 19, 2005 urine test resulted in a false positive.

*D.    The Board's Decision*

The AJ issued an Initial Decision on December 1, 2006, sustaining DHS's charge against Meza and the penalty of removal. Meza v. Dep't Homeland Sec., No. DA-0752-06-0240-I-2 (M.S.P.B. Dec. 1, 2006) ("Initial Decision"). Acknowledging that Meza consistently denied using cocaine, tested negative for drugs in two urine and two hair tests, and passed a polygraph examination, the AJ nevertheless found that "the agency

has proven by preponderant evidence that the urine provided by appellant on September 19, 2005, tested positive for cocaine." Id. at 18. The AJ explained that a urine test can only show cocaine use within the preceding 48 to 72 hours, and thus Meza's negative urine tests on September 30 and October 3, 2005 were irrelevant to his alleged cocaine use before September 19, 2005. Id. Further, the AJ was not persuaded by Meza's negative hair tests, finding that it is "possible for a person who only used cocaine on one occasion to have a negative hair follicle test." Id. at 19.

Meza did not file a petition for review by the full Board, so the AJ's Initial Decision became final on January 5, 2007. On March 6, 2007, Meza filed a timely appeal; we have jurisdiction under 28 U.S.C. § 1295(a)(9).

DISCUSSION

Our review of Board decisions is limited by statute. "We must affirm the Board's decision unless we find it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence." Campion v. MSPB, 326 F.3d 1210, 1212 (Fed. Cir. 2003) (citing 5 U.S.C. § 7703(c)). Where a drug test is challenged before the Board, "[t]he agency bears the burden of proving by a preponderance of the evidence that the test on which it relied to remove the appellant was valid," including by showing "that the urine sample that tested positive was the appellant's." Boykin v. U.S. Postal Serv., 51 M.S.P.R. 56, 58 (1991).

Here, Meza does not dispute that urinalysis is a valid testing method, but argues that agency failed to prove in this case that the positive urine was Meza's and was tested correctly. The AJ disagreed, finding that Meza's urine was properly tested and

was positive for cocaine metabolite, and we may only review those factual findings for substantial evidence. This is "a lower standard of proof than preponderance of the evidence." 5 C.F.R. § 1201.56(c)(1). In other words, even if we would be inclined to find the facts differently in the first instance—for example, to find that Meza had never used cocaine—we must accept the AJ's view of the facts as long as the record contains "such relevant evidence as a reasonable mind might accept as adequate to support" the AJ's conclusions. Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 217 (1938); Giove v. Dep't of Transp., 230 F.3d 1333, 1338 (Fed. Cir. 2000); see also 5 C.F.R. § 1201.56(c)(1) (substantial evidence is "the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion even though other reasonable persons might disagree") (emphasis added).

Applying this deferential standard of review to the record in this case, we cannot overturn the AJ's findings. The documentary evidence and testimony before the Board support reasonable conclusions that the chain of custody for Meza's September 19, 2005 urine sample was intact, the tests by Northwest Toxicology and El Sohly Laboratories were performed properly, and the test results were reliable, establishing that Meza's urine contained cocaine metabolite. Against these conclusions, Meza argues that his actions are consistent with a clear conscience and inconsistent with drug use. But because he is unable to point to any flaw in the collection and testing procedure that led to his positive result, that result stands as substantial evidence of drug use.

In particular, it appears that Meza made every effort to clear his name after being informed of his positive urine test, including commissioning additional urine and hair tests and a polygraph exam, as well as seeking out a DNA test to establish the source of the positive urine sample. But while the results of those later tests were consistent with Meza's denial of drug use, they did not directly contradict the September, 2005 positive result. Meza's subsequent urine samples were negative for benzoylecgonine, but were collected too long after the positive sample to be probative of the same time period; Meza's hair tested negative for cocaine, but both experts testified that a hair test might fail to uncover one-time cocaine use;[1] and Meza's pursuit of DNA testing strongly suggests that he had nothing to hide—as the test could have proven him to be the source of the positive urine sample—but the results of the DNA test were inconclusive.

Meza argues that the AJ gave more weight to Dr. Mattingly's testimony than to Dr. Lykissa's, and that this was an error because Dr. Mattingly had not previously testified as an expert regarding drug screening (as had Lykissa) and had less experience with hair testing than did Dr. Lykissa. Given these differences, Meza argues, the AJ should have accepted Dr. Lykissa's conclusion that the positive urine test was "an outlier" and "an anomaly" as compared to Meza's subsequent, negative tests. But Meza consented to Dr. Mattingly being determined to be an expert witness before the Board, and he cannot now take issue with her qualifications. To the extent Meza argues that Dr. Lykissa was simply more credible than Dr. Mattingly, we note that

---

[1] Dr. Mattingly: "Q: Is it possible to have ingested cocaine and never have it show up in a particular hair? A: Yes"; Dr. Lykissa: "Q: So if you're a one-time user of cocaine . . . [i]t's possible that you would never reach the .5 [nanograms/milligram] cutoff [of cocaine/hair necessary to yield a positive hair-follicle test]? . . . A: I will answer it by saying it is possible, but a very low probability."

the AJ's credibility determination is "virtually unreviewable." Hambsch v. Department of the Treasury, 796 F. 2d 430, 436 (Fed. Cir. 1986).

Meza also argues that the AJ should have drawn an adverse inference against DHS for its failure to call Ron Shearon, the Certifying Scientist at Northwest Toxicology, as a witness. But an adverse inference "cannot fairly be drawn except from the non-production of witnesses whose testimony would be superior in respect to the fact to be proved," and testimony is not superior if it "would have contributed only marginally to the agency's satisfaction of its burden of proof concerning the charge against appellant." Shustyk v. U.S. Postal Serv., 32 M.S.P.R. 611, 614 (1987) (internal citation omitted). Since Avila and George testified that the chain of custody for Meza's urine sample was intact and that the testing laboratory took adequate safeguards under HHS guidelines, Shearon's testimony would have contributed only marginally to DHS's case. Therefore the AJ did not err by failing to draw an adverse inference against DHS.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Board.

## COSTS

Each party shall bear its own costs.